UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JANINE COSTANTINO,               )   13-CV-06667
                                 )
          Plaintiff,             )
                                 )
                                 )
                                 )
     vs.                         )
                                 )
CITY OF ATLANTIC CITY, et al.,   )
                                 )   Camden, NJ
          Defendants.            )   December 12, 2014
                                 )   1:29 p.m

TRANSCRIPT OF PORTIONS OF HEARING
BEFORE THE HONORABLE JOEL SCHNEIDER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:         JENNIFER ANN BONJEAN, ESQUIRE
                           STACY BAGALOO, ESQUIRE
                           BONJEAN LAW GROUP, PLLC
                           1000 Dean Street, Suite 345
                           Brooklyn, NY 11238

For the Defendant          A. MICHAEL BARKER, ESQUIRE
City of Atlantic City:     TODD J. GELFAND, ESQUIRE
                           BARKER, GELFAND & JAMES
                           Linwood Greene
                           210 New Road, Suite 12
                           Linwood, NJ 08221

For Dusk Nightclub:        JOHN ANTHONY UNDERWOOD, ESQUIRE
                           UNDERWOOD & MICKLIN, LLC
                           1236-J Brace Road
                           Cherry Hill, NJ 08034

For the Defendant
Officer Sterling           MICHAEL E. RILEY, ESQUIRE
Wheaten:                   LAW OFFICES OF RILEY & RILEY
                           The Washington House
                           100 High Street, Suite 302
                           Mt. Holly, NJ 08060

For Defendant              ROGER LAI, ESQUIRE
Boardwalk Regency:         COOPER LEVENSON
                           1125 Atlantic Avenue
                           Atlantic City, NJ 08401

```
Audio Operator:          SARAH ECKERT


Transcribed by:          DIANA DOMAN TRANSCRIBING, LLC
                         P.O. Box 129
                         Gibbsboro, New Jersey  08026-0129
                         Office:  (856) 435-7172
                         Fax:     (856)  435-7124
                         Email:   dianadoman@comcast.net
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Dr. Jon Shane | 38(Bon) | 73(Gel) | 103(Bon) | 117(Ril) |
| | | 99(Ril) | 123(Bon) | |
| Voir Dire | 35 | | | |

OFFER OF PROOF - REPRESENTATIVE SAMPLE ISSUE

Ms. Bonjean                                      8

Mr. Gelfand                                 14, 31

Mr. Riley                                     27

1      (Requested portion heard at 1:29 p.m.)

2              THE COURT:  We're on the record.  This is the matter

3      of Costantino v. City of Atlantic City, Docket 13-6667.  Could

4      we have the entries of appearance starting with the plaintiff,

5      please?

6              MS. BONJEAN:  Good morning, Your Honor -- good

7      afternoon.  Jennifer Bonjean, B-O-N-J-E-A-N, of the Bonjean

8      Law Group and Stacy Bagaloo, B-A-G-A-L-O-O, on behalf of the

9      plaintiff Janine Costantino.

10             MR. GELFAND:  Good afternoon, Your Honor.  Todd

11     Gelfand from the law firm of Barker Gelfand & James.  I'm here

12     with Mr. Barker on behalf of the City of Atlantic City.

13             MR. BARKER:  Good afternoon, Your Honor, Michael

14     Barker on behalf of the City of Atlantic City.

15             MR. RILEY:  Good afternoon, Judge.  Mike Riley on

16     behalf of Officer Sterling Wheaten.

17             MR. UNDERWOOD:  Good afternoon, Your Honor.  John

18     Underwood, Underwood Micklin, on behalf of Dusk Nightclub.

19             MR. LAI:  Good afternoon, Your Honor.  Roger Lai

20     from the law firm of Cooper Levenson on behalf of the

21     defendant Boardwalk Regency Corp.

22             THE COURT:  Counsel, I just want to repeat what we

23     said on the phone the other day, and I really mean it.  Let us

24     help you coordinate the handling of these cases.  If there's

25     something Judge Donio and I can help with the coordination in

1    terms of scheduling, please let us know.

2            We schedule things independently, so you know better

3    than us if we could coordinate things.  But today's a good

4    example that it makes sense to have you all here on the same

5    day.  So I just urge you to use you commonsense and let us

6    know about that, because we're not here to burden you.

7            MR. GELFAND:  Thank you very much, Your Honor.

8            THE COURT:  The issues on the agenda today are the

9    representative sample issue, the motion for the depositions of

10   the attorneys.  I expect you'll get a ruling on that today.

11   The motion for additional information from Atlantic City,

12   barring unforsen circumstances, I expect you'll get a ruling

13   on that today.

14           I don't know what the dispute is yet, the Atlantic

15   City request to the casino, but if it's what I expect it to

16   be, you'll get a ruling today.  My best guess is I'm going to

17   reserve on this representative sample issue, because there's a

18   lot of consider.  But we'll cross that bridge when we come to

19   it.

20           The first issue I wanted to address is -- I made

21   that disclosure on the record the other day about my past

22   acquaintance with Lieutenant Hendricks.  I have nothing to add

23   to that.  Everything I had to say is put on the record, and I

24   wanted to find out if anyone here any objection to proceeding

25   this afternoon.

1          MS. BONJEAN:  Your Honor, plaintiff has no objection

2     to proceeding.

3          MR. BARKER:  Your Honor, Michael Barker, on behalf

4     of the City of Atlantic City.  No objection.

5          MR. RILEY:  Judge, Mike Riley on behalf of Sterling

6     Wheaten, no objection.

7          MR. UNDERWOOD:  Your Honor, John Underwood on behalf

8     of Dusk, no objection.

9          MR. LAI:  Roger Lai on behalf Boardwalk Regency, no

10    objection.

11         THE COURT:  Thank you, counsel.  Okay.  We'll deal

12    with the representative sample issue first.  And if things go

13    as expected, whoever -- Mr. Shane is out there, we should get

14    you out of here by 4:00, if not earlier.

15         The issue -- let's frame the issue.  And then I'd

16    like to start by getting an offer of proof from both sides.

17    The issue as framed is this.  The Court has already ordered

18    the production of the internal affairs files of the defendant

19    officers.

20         I don't think there's a dispute about that.  Now --

21    meaning Atlantic City didn't agree with the Court's ruling,

22    but the ruling is the ruling.  Plaintiff originally requested,

23    if the Court recalls, copies of all of Atlantic City's

24    Internal Affairs files.

25         It's the Court's best recollection that I think that

1      number is somewhere between 1,800, 2,000.  We don't need to

2      know the exact number, but it's in that ballpark.  At the time

3      I indicated to plaintiff that I was not going to order the

4      production of all the IA files, but consistent with the

5      Court's opinion in <u>Groark</u>, I would order the production of a

6      "representative sample."

7              Plaintiff produced an expert report in this case,

8      which I believe, and the report speaks for itself, it said a

9      representative sample would be, I think the number was 621

10     Internal Affairs files.

11             Atlantic City objects to that number.  So plaintiff

12     had asked for a hearing on the issue, and I think the issue is

13     important enough to have a -- to hear some evidence on that,

14     because of the implications of the ruling.  So the issue

15     before the Court is, what is a representative sample?  And how

16     many, if any, additional IA files would be produced.

17             Now just to complete the record, and I think I've

18     said this two or three times, that I know this was the case in

19     the <u>Groark</u> case.

20             I believe, but I'm not going to put words in

21     plaintiff's mouth, that the position of the plaintiffs in this

22     case was similar that, what plaintiff is concerned about is if

23     we get to trial and they're expert gives an analysis of the,

24     whatever it is, 80 or 100 files that they've reviewed thus

25     far, he gives an opinion on the <u>Monell</u> issues that they're

1    concerned that Atlantic City is going to argue that that

2    opinion should be discredited because it -- the plaintiff --

3    the expert did not look at a "representative sample."  So

4    that's why plaintiff wants all the IA files.

5            So that's the Court's understanding of the

6    background of why we're here.  Plaintiff, what is -- we'll

7    hear from your expert, but let's have your offer of proof as

8    to what your expert's going to say.

9            MS. BONJEAN:  Thank you, Your Honor.  Today, Your

10   Honor, I expect Dr. Shane to testify consistent with his

11   written report, which sets out a explanation for how you

12   derive a sample set.  How you cull the data to make certain

13   inferences and conclusions from that data.

14           He will testify to the Court that the first thing

15   you do in determining how much data you need in order to make

16   fair and reliable inferences, is by doing a statistical -- or

17   a power analysis.

18           And this is formulaic, this is not something Dr.

19   Shane made up, this is part of well-established social science

20   literature, that when you're measuring effects in certain

21   things you plug in these numbers, he's going to be able to

22   explain this to a much better degree than I can, and also it's

23   set out in his report.

24           And that this is the amount of data that we need in

25   order to make certain reliable conclusions and inferences.

1    Now --

2              THE COURT:  Is it going to be your expert's position

3    that if we lived in a perfect world and you got everything you

4    wanted, you would like to see not a representative sample, but

5    you would like to see every file?

6              MS. BONJEAN:  That's right, Your Honor.  My -- Dr.

7    Shane is going to testify that, as when you're looking at

8    data, the preference is to look at the entire population.  And

9    in this case, the entire population would be all Internal

10   Affairs.

11             And there's many reasons why you want the entire

12   population.  One is, much of -- many of the files we're going

13   to look at are not going to be usable for analysis, because

14   they're going to be missing data.

15             And they're going to automatically drop out.  So we

16   have to have a buffer, so to speak, because if you have an

17   Internal Affairs report that the complainant came forward, but

18   then the officers could never reach that complainant again,

19   okay, that Internal Affairs record might be closed, because

20   the complainant disappeared from the face of our planet.

21             It's not an appropriate file to use as part of the

22   analysis perhaps in one hypothesis you're trying to check out.

23   So you're going to lose a lot of data.  That's why the --

24   that's one of the reasons that we have the number.  The other

25   is, is what percentage of an effect do we want to test?  And

1    that effect number can go up or down depending on, you know,

2    how -- how reliable you want it to be.

3            So, again, Dr. Shane can testify to this in better

4    detail than I can.  But certainly in a perfect world, the

5    entire population is preferable.

6            THE COURT:  Is it -- just for the record, is it

7    correct that the reason you came back -- your expert came

8    back, I think the number's, again, 621?

9            MS. BONJEAN:  It's 721, Your Honor.

10            THE COURT:  721.  It speaks for itself.

11            MS. BONJEAN:  Yes.

12            THE COURT:  But the reason he came back with that

13    number was because the Court preliminarily indicated that it

14    wouldn't give you the entire universe.

15            MS. BONJEAN:  Correct, Your Honor.  I assumed from

16    this Court's prior decision in _Groark_ that the Court was

17    unlikely to give me the entire universe, or give the plaintiff

18    the entire universe, so I wanted to be preemptive about it and

19    asked Dr. Shane to consider what would be a random sampling.

20            THE COURT:  Let me ask you a few more questions.

21            MS. BONJEAN:  Yes, Your Honor.

22            THE COURT:  When you get and I'm -- I'm not

23    committing you to this, and if you think it's work product you

24    don't have to tell the Court.

25            MS. BONJEAN:  Sure.

1          THE COURT:  If you get additional IA files, do you

2     intend to do anything with them except do an expert analysis

3     and a statistical analysis?  Or will you try and reach out to

4     some of the complainants or witnesses?

5          MS. BONJEAN:  Your Honor, my purpose in using the

6     Internal Affairs histories that fall outside the scope of the

7     individual defendant officers, in this case which is only

8     officer Wheaten, purely for statistical analysis, and analysis

9     of the data that I want to use from this -- from this

10    collection of Internal Affairs history is to -- is for the

11    expert purpose only.

12         And it's -- I don't anticipate doing independent

13    investigation of each of these files.  I'm not -- I would not

14    represent that as to Officer Wheaten's Internal Affairs

15    history himself, but as to the other Internal Affairs history,

16    if the Court is concerned about confidentiality of the

17    complainants, et cetera.

18         THE COURT:  Next question.  And then I'll turn to

19    defendant.  What is your offer of proof about -- what your --

20    how your expert will decide which of the 721 files should be

21    produced?  In other words, how do you select a relevant

22    sample?

23         MS. BONJEAN:  Yes.  Your Honor, Dr. Shane's report

24    actually has a section, and I'm going to refer to it, if the

25    Court doesn't mind.  What he proposes, and he will tell you a

1    little bit -- you can see from his CV that he teaches a

2    graduate course in statistics, he's done this type of analysis

3    in other context, that what he recommends, and based on his --

4    he is a former police officer with the Newark Police

5    Department, and he was the head of policy and -- which

6    impacted Internal Affairs.

7         So he has not only real life experience in this

8    field, but also the science behind it.  His proposal for the

9    sampling strategy is to draw a proportion of the cases from

10   each stratus, which would be each year, until reaching the

11   total number of cases that the Court decides on, if it's 721,

12   which is what we propose.

13        And once the total number of cases for each year is

14   known, then there's a process that should apply to each year

15   to ensure that the sample is randomly drawn.  And he lays this

16   out, there's a great deal of math involved, but it's on page

17   six and seven of his report -- six, seven, eight.

18        And so hypothetically he says that there are 2,002

19   cases involved, he's looking to pull about 36 percent, and

20   that he would pull a certain percentage from each year.

21        An the way to do it in practical terms is that there

22   should be an index card of every Internal Affairs file that's

23   out there.

24        THE COURT:  There should be an index card for every

25   officer who had an Internal Affairs complaint lodged against

 1    him --

 2              MS. BONJEAN:  Your Honor --

 3              THE COURT:  -- or her.  Theoretically.

 4              MS. BONJEAN:  Your Honor -- Your Honor -- I don't

 5    know --

 6              THE COURT:  We don't know.  Correct.

 7              MS. BONJEAN:  I don't have the inside understanding

 8    of what happens in Atlantic City.  I know that Dr. Shane can

 9    testify what happened in the other police departments and what

10    national norms would be.

11              I believe Lieutenant Hendricks might be able to shed

12    some light on this.  But as I understand it, we should be able

13    to for each year identify, at least with a number, every

14    Internal Affairs -- and, hopefully, I would presume a type of

15    complaint.

16              And then pull from each year so that we don't --

17    like there might be one year where you have, you know, an

18    exceptional amount of Internal Affairs complaints made.  You

19    don't want to focus on that year, you want to make sure it's a

20    stratified random sampling.  And I believe Dr. Shane has

21    proposed a methodology for doing that, that is not

22    particularly burdensome.

23              But I guess, you know, defendants may have a

24    different perspective.

25              THE COURT:  I mean, we really struggled -- the Court

1    really struggled with this issue in <u>Groark</u>, because I just

2    tried to pick a random way to pick random files.  Frankly, I

3    don't know if that's the best and most logical way to do it.

4            But it was completely random.  So, for example, if

5    we pick a year nine -- just pick a year, 2010.

6            MS. BONJEAN:  Okay.

7            THE COURT:  And the Court says you get 30 files.

8    And during that year there were 200 files opened.  Will your

9    expert say how he's going to propose to select the 30 out of

10   the 200?

11           MS. BONJEAN:  Yes, I believe he is going to testify

12   how to do that.

13           THE COURT:  Okay.  Great.  Okay.  Defendant Atlantic

14   City -- let's now turn to defendant.  What's your offer of

15   proof about what your expert is going to say?

16           MR. GELFAND:  Your Honor, our expert's going to say

17   that the problem is the 721 number is derived by mathematical

18   and statistical formulas based upon the number of variables

19   that plaintiff's expert starts with, and ultimately within the

20   report, you'll see that's 44.  If that 44 variable number goes

21   up, the number he needs for a representative sample goes up.

22           If that 44 number goes down, the number needed for a

23   fairly representative --

24           THE COURT:  Is that 44 derived from the total number

25   of IA complaints during this time period?

 1          MR. GELFAND:  No, I'm sorry, that 44 is individual

 2   factors that he proposes to be reviewed in each Internal

 3   Affairs case from the random sample in order to make certain

 4   conclusions.  And, again, that number 44, whether we bump that

 5   up, bump that down, that has that direct correlation on the

 6   721 number.

 7          And what we're going to propose to show you through

 8   this hearing, is that those 44 factors that plaintiff's expert

 9   has identified in his report are not factors which are

10   addressing the question at the heart of the <u>Monell</u> question.

11   For example, we have factors listed within that 44 that are

12   contributing to that very high 721 number.  We say very high

13   721 number, factors such as gender, location where the

14   incident happened, raids.  But in this case, we don't have a

15   claim that Atlantic City disproportionately dismisses

16   complaints from black people.

17          Or disproportionately dismisses complaints from this

18   location of town versus this location of town.  The plaintiff

19   has chosen to make their <u>Monell</u> claim in this case that the

20   practice and custom we're asserting at issue is that Atlantic

21   City has practice and custom of exonerating all of its

22   officers from Internal Affairs allegation.

23          That's essentially the custom as I --

24          THE COURT:  Excessive force.

25          MR. GELFAND:  If it's limited to the excessive

1   force, that's my misunderstanding.

2             THE COURT:  Well, no, you're right, Mr. Gelfand.

3   Fair enough.  You're right.  We don't have that commitment

4   yet.  You're right.

5             MR. GELFAND:  And I thought --

6             THE COURT:  You're right.

7             MR. GELFAND:  -- I thought it specifically had been

8   denied.

9             THE COURT:  You're right.

10            MR. GELFAND:  I thought what we had been told was

11  the custom we're seeing is --

12            THE COURT:  You're right.

13            MR. GELFAND:  -- it dismisses -- they exonerate all

14  of the officers.

15            THE COURT:  You're right.

16            MR. GELFAND:  Well if they exonerate all of the

17  officers, to get to the heart of the Monell question and

18  whether each individual file supports the custom that's being

19  alleged or doesn't support the custom that's being alleged,

20  what we really need to do is actually look at each file on an

21  individual basis, not for the 44 factors that are listed in

22  plaintiff's report, but to determine whether when you look at

23  the file on the whole, does it appear to be complete,

24  thorough, fair and objective investigation.

25            For example, are there eyewitnesses that weren't

1   interviewed?  We're not going to know that from a yes/no check

2   off of the 44 factors that are in plaintiff's list.  And if we

3   cut that 44 down to the two or three that actually had some

4   relevance to the custom that plaintiff's alleging, plaintiff's

5   statistician I think is going to tell us that if we had two or

6   three instead of 44, our sample size would be something -- our

7   necessary sample size would be something a lot less than 721.

8           The other thing we're asking Your Honor to focus on

9   in addressing this issue, is that there's a causation factor

10  with this custom argument under Monell.  The Monell, it has to

11  be proven first that we've got a constitutional violation.

12          I don't know if Your Honor's going to be willing to

13  consider bifurcation of this issue at all, because we're

14  talking --

15          THE COURT:  At trial?  That's not for me to --

16          MR. GELFAND:  For discovery purposes.

17          THE COURT:  No.

18          MR. GELFAND:  If we get -- I'm assuming no, which is

19  why I'll walk past that.  Because we are doing massive

20  discovery potentially about an issue which is never relevant

21  unless we get to Wheaten having committed --

22          THE COURT:  No, we're not bifurcating discovery.

23          MR. GELFAND:  Fair enough.  But there's still the

24  causation issue.  There's only the Monell liability, assuming

25  for a second we have this custom of sweeping all Internal

1    Affairs cases under the rug, rather than fair, thorough and

2    objective investigations, that custom is still only <u>Monell</u>

3    only liability for Atlantic City if it caused Officer Wheaten

4    to do what he did.

5             Which means that Officer Wheaten, assuming there's

6    such a custom, has to have knowledge that that's the custom.

7    And we're talking about embarking on a pretty -- if plaintiff

8    gets what they're looking for, a pretty, again, massive

9    discovery situation when we don't even have the preliminary

10   information, cart ahead of the horse, to suggest that if

11   there's such a custom, Officer Wheaten knows about it.

12            We're talking about a on in some level, except for

13   where Court's tells us we have to release Internal Affairs

14   files, and certain limited information from Internal Affairs

15   files has to be released publicly, but other than that, we're

16   talking about a confidential process.

17            We don't have any reason to know, and we certainly

18   don't have it established through discovery, or an undisputed

19   fact that Officer Wheaten has any information as to how

20   Internal Affairs cases are disposed of in a routine basis,

21   either within the past however many years we go by, or as the

22   custom in Atlantic City.

23            If Officer Wheaten certainly doesn't, on paper, by

24   policy legally have access to all that information --

25            THE COURT:  Mr. Gelfand, isn't that a question of

1    fact for the jury?  What he knew or didn't know?  He worked

2    there for X years.  Can someone realistically say he didn't

3    know how things worked inside the Department?  Does he have to

4    get a piece of paper and acknowledge on a piece of paper that

5    he knows what the Internal Affairs practice is?

6           MR. GELFAND:  No.  But I think more specifically

7    what's relevant in this case is, does he know whether or not

8    Internal Affairs does complete, thorough and objective

9    investigations.  As to the Internal Affairs process --

10          THE COURT:  Well let me stop you one more time,

11   because I think I see where you're headed, but I don't

12   necessarily agree with your premise.  I'm not deciding the

13   issue, obviously.  But I don't necessarily agree with your

14   premise to show causation you have to show that Wheaten had

15   knowledge of it.

16          The argument I -- one of the arguments plaintiff is

17   making is that if Atlantic City had been doing what they were

18   supposed to do, Wheaten wouldn't be on the street.  He

19   wouldn't have been in that nightclub.  He wouldn't be in these

20   nightclubs where he's in a position where he can exercise

21   excessive force.

22          That has nothing to do with his knowledge.  Am I

23   wrong, Ms. Bonjean?  Is that part of your argument?

24          MS. BONJEAN:  That's absolutely correct, Your Honor.

25          THE COURT:  Okay.

1          MS. BONJEAN:  I don't believe knowledge is an

2    element.

3          THE COURT:  Okay.  So I don't necessarily accept

4    your premise that Wheaten has to have knowledge of it.  I

5    think a big part of this case, not the only part, is

6    plaintiff's argument that Wheaten should not have been where

7    he was because of mere knowledge of his past practices and

8    past incidents.

9          MR. GELFAND:  In that case we shouldn't be looking

10   at discovery of any Internal Affairs files other than

11   Wheaten's.  Because if we're talking about the specific

12   deterrence, they should have seen that Wheaten was a problem,

13   he should have been disciplined and fired before we got there.

14   If that's the case.  If they have sufficient information that

15   they should have fired Wheaten, the other Internal Affairs

16   files for other officers aren't going to bear on that issue at

17   all.

18         THE COURT:  We're not here to go over old ground,

19   because Atlantic City appealed that issue.  I ruled on that

20   issue, Atlantic City appealed it, and then they withdrew the

21   appeal.  I'm not going to tell plaintiff how to prosecute

22   their case, I'm not going to tell Atlantic City how to defend

23   its case.

24         If plaintiff wants to limit it just on Wheaten, they

25   can do that.  If they want to broaden the scope, they have a

1    right to do that.  And then you could argue what you want at

2    your summary judgment stage.

3           But in the interests of moving this along, let me

4    cut to the chase, Mr. Gelfand.  Let's just cut to the chase.

5    Atlantic City says 721 files is not a representative sample,

6    it's too much.  What is the number that Atlantic City says is

7    representative?

8           It's the Court's understanding, and you can correct

9    me if I'm wrong, that at present plaintiff has approximately,

10   and this is just a guess, 80 to 100 files.

11          Wheaten, and if there's other defendant officers in

12   the case.  Okay?

13          MR. GELFAND:  Understood.

14          THE COURT:  What is the number, if 721 is not the

15   number, if it's too much to be representative, what is the

16   right number?

17          MR. GELFAND:  The number that plaintiff already has.

18          THE COURT:  Okay.  So let me -- let's -- again,

19   let's just cut to the chase.  Are you going to argue at trial,

20   assuming just for the sake of argument that plaintiff has 80

21   to 100 files, just for the sake of argument.  If plaintiff has

22   80 to 100 files, are you going to argue that when their expert

23   does their analysis at trial, that that opinion should be

24   discredited because it's not representative of Atlantic City's

25   practices?

1            That's what this is all about.

2            MR. GELFAND:  It's hard to predict, because that

3    assumes a lot of things that happened between today and when

4    we get to trial.  What I'm suggesting to you, Judge, is given

5    the burdensome nature of the discovery demand, and given the

6    confidentiality concerns that are there and as a matter of

7    law, that before we embark on the burden and intruding into

8    the confidentiality, take the files that they have and see if

9    they can make the Monell argument.

10           Because when I say see if they can make the Monell

11   argument, you're shaking your head no, I'm going to take that

12   to mean --

13           THE COURT:  No, because we're not --

14           MR. GELFAND:  -- should I stop speaking, I lose?

15   Or --

16           THE COURT:  -- we are not bifurcating discovery, we

17   are not bifurcating discovery.

18           MR. GELFAND:  I'm not saying bifurcate discovery in

19   the traditional sense of, we'll deal with the Monell issue

20   after the underlying constitutional violation.

21           THE COURT:  So we'll go through the whole case,

22   you'll file your motion for summary judgment.  It's gra -- and

23   then depending if it's granted or denied, we're going to come

24   back here and do discovery again, and we're going to re-file

25   the motion?

1            MR. GELFAND:  That's not what I'm suggesting.  I

2    didn't get finished stating -- what I'm suggesting is, they've

3    got this 60 to 100, whatever it is, already.  The <u>Monell</u>

4    standard for a custom, because we're not talking about a

5    policy written down somewhere.

6            We don't have a policy that says we're going to

7    sweep Internal Affairs files under the rug.  That's not the

8    allegations made, it's the custom and practice that's at

9    issue.

10           The custom or practice that's at issue for <u>Monell</u>

11   purposes, based upon what Your Honor said in the first <u>Groark</u>

12   opinion, it has to be so routine, such an entrenched policy

13   that it has the force of law.

14           And if they can't make a preliminary showing to Your

15   Honor based on the files they already have, then it doesn't

16   warrant going any further.  So don't bifurcate the whole case

17   discovery wise, but don't make us go through discovery of 721

18   or 2,000 Internal Affairs files, if they can't even show the

19   force of law from the 80 that they have.

20           THE COURT:  You want the Court to rule on a

21   preliminary partial motion for summary judgment?

22           MR. GELFAND:  That's not what I -- no.  What I'm

23   asking is that there's more information -- the Court should

24   have to have some showing to warrant the intrusion into the

25   confidentiality and to warrant the burden.

1           And that showing, based upon what they're alleging,

2   should be able to be either made preliminarily, or disproven

3   to Your Honor from 60 to 100 files.  Because, for example, if

4   they go through those 60 to 100 files and can't convince Your

5   Honor that even five of them involve allegations being swept

6   under the rug, then we know that they can't prove that it's a

7   custom that has the force of law in Atlantic City because they

8   can't even --

9           THE COURT:  And I would answer that question like

10  this, Mr. Gelfand.  Because we have a history here and maybe

11  I'm going outside the record of Costantino.  But I'm not going

12  outside the record of Atlantic City and Mr. -- Officer

13  Wheaten.  The Court has already said, in effect, that

14  plaintiff has made that showing.  The Court has said that

15  plaintiff has made that showing, because in this -- I don't

16  have the exact numbers, they're cited in my Groark opinion.

17          I cited the total number of excessive force

18  complaints against Groark and Timek.  I don't remember exactly

19  what I said.

20          For some reason the number 86, or something similar

21  to that --

22          MR. GELFAND:  It's like 30 and 30, 27 and 32 --

23          THE COURT:  No, it was more than 30 and 30.  It was

24  not 30 and 30.

25          MR. GELFAND:  In Groark?

1          THE COURT:  Adding Timek and Wheaten together, it

2     was certainly more than 30 and 30.  And the Court already

3     indicated preliminarily that because there were so many

4     excessive force complaints, and because this had happened time

5     and time again and they were never disciplined, that for

6     discovery purposes, for discovery purposes only, that was a

7     prima facie case that they could get more.

8          The Court, to be clear, never ruled, never ruled

9     that in every case a plaintiff gets non-defendant officer's IA

10    files.  I went to great lengths to make sure I didn't go that

11    far in the opinion.  But I said, in a case like this where it

12    was so egregious, there was so many IA complaints for

13    excessive force, with no action being taken over so many

14    years, that that justifies expanding the scope of discovery.

15         So I think we already did what you're asking the

16    Court to do.

17         MR. GELFAND:  I'm not so sure.  And if Your Honor's

18    sure after I say one more things, then I'll stop and I'll stop

19    harping on it.

20         THE COURT:  Say whatever you want, Mr. Gelfand.

21         MR. GELFAND:  All right, Judge.  But didn't Your

22    Honor say at the same time, that justifies -- what you just

23    described justifies plaintiff's from Groark getting all of

24    Timek and Wheaten's Internal Affairs files, but they're still

25    going to have to show to prove their custom, that the custom

1    is dismissing cases that should have been sustained.

2            Well now that they have 60 to 100 files to show Your

3    Honor, not just the numbers, because Your Honor said just the

4    numbers don't do it, they got to show that within those

5    numbers they're customarily dismissing cases that should have

6    been sustained.

7            THE COURT:  At trial.  For trial purposes.  We're in

8    the discovery world now.

9            MR. GELFAND:  Right.  But if they can't meet that

10   showing from the 60 they have, then Your Honor is ordering an

11   inordinately burdensome and confidentiality invading discovery

12   for things that are irrelevant, because if they can't show

13   cases that should have been sustained within the 100, or the

14   60, then they can't prove that it's a custom.

15           Because if it's zero out of 60, it's not a custom.

16   No matter what the other 261 show -- 211, my math is bad.

17           THE COURT:  Okay.  We can agree to disagree,

18           MR. GELFAND:  Fair.

19           THE COURT:  I think we can agree that the case law

20   seems to indicate, although it's not unanimous, that

21   statistics alone is not enough to prove a Monell claim.  But

22   we're in the discovery world, we're not at trial.  And I don't

23   have to hold plaintiff to prove her case today, or in

24   discovery.

25           So we'll continue with this.  I mean, I -- we want

1    to get to the experts, but this -- this offer of proof is

2    helpful.  But I guess as hard as I'm trying to get Atlantic

3    City to commit to a specific number, it won't.  And it won't

4    commit that the files that plaintiff already has are

5    representative.  And it won't commit to giving me a number

6    that it will agree is representative, so that's why we have to

7    go through this hearing.

8              MR. RILEY:  Judge, if I may?  With regard to the

9    number, and this is a familiar issue between the Court and

10   Atlantic City.  We've had the experience in <u>Groark.</u>  We've had

11   conversations about it.  You've even ruled after the

12   submissions by the plaintiff in <u>Groark</u> that the number 32 was

13   the appropriate number.  And you then in your opinion very

14   thoughtfully laid out exactly the mechanism that you suggested

15   we should do that.

16             And that was considered by the Court, based on the

17   evidence that you had before you, that that was in fact an

18   adequate representative sampling.  And I think you still

19   believe that to today.

20             THE COURT:  Under the record in <u>Groark</u>, of course.

21             MR. RILEY:  Okay.  We appealed that.  And we

22   appealed several things.

23             THE COURT:  Right.

24             MR. RILEY:  One thing that we've withdrew our appeal

25   on was the number 32.

1          THE COURT:  Right.  But didn't you also appeal --

2     didn't you also withdraw the appeal -- you also appealed the

3     issue when the Court held that the plaintiff could get IA

4     files for other than the defendant officers?

5          MR. RILEY:  We appealed that, and I have not

6     withdrawn that appeal.

7          THE COURT:  Really?

8          MR. RILEY:  Yes.

9          THE COURT:  Okay.

10          MR. RILEY:  Yeah.  I'm going to probably talk of

11     that on Monday with the Court.  But in any event, the 32 files

12     as decided by the Court, the plaintiff's inquiry in Groark is

13     exactly the same inquiry that the plaintiff has in this case,

14     essentially.  It's identical.

15          In fact, there's more than that.  It's the same Bar,

16     the same situation, Sterling Wheaten was involved in both.

17     Okay?  There's so many commonalities to this, that the fact

18     that we've been talking about numbers beyond 32 is somewhat

19     baffling.

20          THE COURT:  Here's -- look, I'll let you finish, but

21     there's -- you know my answer to what you're going to say.

22          MR. RILEY:  I do.  I do.

23          THE COURT:  Counsel, Mr. Gelfand has suggested that

24     since plaintiff has a 100 or 150, or however many files she

25     has, that by itself should be a representative sample.

Riley - Argument                                      29

1           THE COURT:  Mr. Gelfand didn't say that.

2           MR. RILEY:  Well but he was --

3           THE COURT:  If he did say that, we would be done.

4           MR. RILEY:  You know, well I think he was close

5    enough that made me greatly concerned, because -- because

6    clearly we've been down this road before.  You've decided, and

7    you've laid it out.  And we withdrew our appeal.  The law in

8    the case in Groark is 32.  If some Appellate Court is sitting

9    back and looking at this down the road, and they say Groark --

10   it was appropriate -- 32 was appropriate in Groark.  Same

11   inquiry, same process, and 721 was appropriate in another case

12   in exactly the same circumstance.  Now they would have said,

13   foolish consistency is the hobgoblin of small minds.

14           But, however, consistency is not.  And our position

15   is on behalf of Mr. Wheaten, that you've discussed it and you

16   addressed it in Groark, and I think the Court's satisfied with

17   this number in Groark.  And now we hear -- and we're listening

18   to these big numbers and middle numbers, and we have

19   statisticians here to talk about a representative sample.

20           I think you can -- you've found a representative

21   sample in a very similar set of circumstances.

22           THE COURT:  Mr. Riley, you know how much I respect

23   you as a individual, as an attorney.  But I couldn't disagree

24   with you more.

25           MR. RILEY:  We can agree to disagree.

1          THE COURT:  We can agree to disagree.  There are

2     material -- significant material difference between this case

3     and <u>Groark</u> is that in this case plaintiff did her homework.

4     In <u>Groark</u> the plaintiff dropped the ball.  The plaintiff did

5     not give the Court any competent evidence about what a

6     representative sample was.

7          The plaintiff gave the Court in that case a two

8     sentence letter from a purported expert about what the number

9     was, and the Court rejected that out of hand.

10          In this case, the plaintiff did her homework, gave

11     the Court competent proof from a competent expert, with a

12     prima facie competent expert report.  And that's the

13     difference, Mr. Riley.

14          The Court bases it's decision on the record before

15     it.

16          MR. RILEY:  But does that force the Court now to go

17     back and look at <u>Groark</u> and say, well, I'm going to reconsider

18     this based on the information I've heard in another case, and

19     I'm going to change the number in <u>Groark</u>?  Because the <u>Groark</u>

20     files are being pulled.  Those 32 files that the Court ordered

21     are being currently pulled.  They're going to be available in

22     a relatively short time.

23          THE COURT:  We'll cross that bridge when we come to

24     it, if after the Court rules in this, case if the plaintiff in

25     <u>Groark</u> wants to move to ask for more files, we'll cross that

1    bridge when we come to it.

2              MR. RILEY:  Okay.  So then we'll proceed now and

3    determine what --

4              THE COURT:  Absolutely.

5              MR. RILEY:  -- what expert makes sense.

6              THE COURT:  I'm not sure that's the issue.  In fact

7    they both could make sense.  But we're -- we're not here to

8    decide essentially who's right and who's wrong.  We're here to

9    decide what discovery should be produced.

10             MR. RILEY:  Very well, Judge.  Thank you.

11             THE COURT:  Last word, Mr. Gelfand?

12             MR. GELFAND:  Yes.  Co-counsel and I just had a

13   little bit of a disagreement as to whether Your Honor already

14   said, for lack of a better term, forget it as to this

15   argument.  But my argument being, why wouldn't the Court

16   consider first, can they make the showing they need to show

17   based upon a smaller number like 32, plus what they have

18   already?

19             THE COURT:  I think they've already done that.  I

20   already said, I think they've done that, because I don't know

21   what the exact number is, the number 86 stands in the Court's

22   head, but I don't know the exact number, it's in the Groark

23   opinion, because the statistics are so overwhelming, that if

24   there was 80 or so excessive force complaints, they were never

25   disciplined, in the Court's view that's so overwhelming for

1    discovery purposes it opens the door for inappropriate

2    circumstances to get more discovery.

3            So I -- I think they've already done that.

4            MR. GELFAND:  Okay.  And Your Honor doesn't think at

5    all that they should have to show, for example, at least one

6    of those cases that should have been sustained, even though

7    they were dismissed?

8            For trial purposes, at least, Your Honor said

9    they're going to have to do that, that's in the decision in

10   Groark 1.

11           THE COURT:  Yes.

12           MR. GELFAND:  But even for discovery purposes if

13   they can't show one out of 60 that should have been sustained,

14   wouldn't that tell Your Honor that they haven't justified the

15   need for the extra burden and the extra invasion in the

16   confidentiality?  Couldn't we start with whether they can show

17   evidence of the custom from a smaller sample before we get to

18   numbers like six and 700?

19           THE COURT:  Mr. Gelfand, whenever the Court writes

20   its opinion, I'm going to cite to opinions where a Courts

21   ordered thousands of IA files to be produced.  There's myriad

22   of cases in New Jersey and around the country where the Court

23   would think -- wouldn't think twice about ordering 500, a

24   thousand, 2,000 files to be produced.

25           And never in -- I've never seen a case where the

1    procedure that you're suggesting has been used.  It's not that

2    unusual to order hundreds, if not thousands of IA files to be

3    produced.

4              MR. GELFAND:  There aren't that many municipal --

5              THE COURT:  This Court is a little bit more

6    conservative than some other Court's, but those opinions are

7    out there.

8              MR. GELFAND:  There's only three or four

9    municipalities in New Jersey that have nearly the number of

10   police officers that Atlantic City has.  So there can't be

11   that many municipalities that have really been ordered to

12   produce thousands of Internal Affairs files, because most

13   municipalities don't have one-fifth of that total number.

14             THE COURT:  I cited them in <u>Groark</u>.

15             MS. BONJEAN:  Actually Atlantic City is the

16   fifty-fifth largest municipality, and leads number one in

17   civil rights lawsuits.  So it's not the -- there are plenty of

18   municipalities that are much larger than Atlantic City in the

19   State of New Jersey.

20             Your Honor, if the defendants would agree that

21   whatever conclusions we draw from Officer Wheaten's Internal

22   Affairs history is -- establishes our <u>Monell</u> claim, we can be

23   done here today.  But they have to agree to that.

24             THE COURT:  I feel like I'm hearing myself over the

25   head waves.  I've said that so many times.  And I'm glad we're

Gelfand - Argument                                        34

1   here on the record.  They won't commit on the record, so we

2   have to -- we have to continue.  So --

3              MS. BONJEAN:  Yes.

4              THE COURT:  -- let's get to your expert.  Let's get

5   to Atlantic City's expert, because I did want to get this

6   gentleman out of here by four as promised.

7              MS. BONJEAN:  Yes.  I believe the defendants' expert

8   needs to leave here by four.  So, Your Honor, at this time --

9   Your Honor, the only small request I -- because we did not

10  have the benefit of any reports from their expert, I am -- in

11  the ideal world --

12             THE COURT:  Do your best.

13             MS. BONJEAN:  -- thank you very much.  I would only

14  ask if there's something I would like my expert to address

15  after hearing his testimony, I would ask for leave to do so.

16  For the moment, I will call Dr. Shane to the stand.

17             THE COURT:  Keeping in mind this is not a trial.

18  This is --

19             MS. BONJEAN:  Understood.

20             THE COURT:  -- a discovery hearing.  So we could

21  hopefully cut to the chase.

22             MS. BONJEAN:  Yes, Your Honor.  I don't expert to

23  belabor this hearing, Your Honor.

24             THE COURT:  Let's get the witness sworn.

25             THE CLERK:  Please raise your right hand.

Shane - Voir Dire                                          35

1          JON M. SHANE, PLAINTIFF'S WITNESS, SWORN

2                THE CLERK:  Please state your name for the record.

3                THE WITNESS:  Jon Shane, S-H-A-N-E.

4                THE CLERK:  Thank you.

5                     VOIR DIRE EXAMINATION

6     BY MS. BONJEAN:

7     Q     Good afternoon, Dr. Shane.

8     A     Hello.  Good afternoon.

9     Q     Can you please state your full name for the Court

10    reporter and the Judge?

11    A     Yes.  John M. Shane, J-O-N on first name.  Middle initial

12    M., as in Michael.  Last name Shane, S-H-A-N-E.

13    Q     Please tell the Court what degrees you hold?

14    A     I have a bachelors of science degree, a master of arts

15    degree, and a doctoral degree, a PhD in criminal --

16                THE COURT:  Can we submit the CV as an exhibit?

17                MS. BONJEAN:  Yes, Your Honor.  Absolutely.

18                THE COURT:  Any objection to the expert testimony --

19    to his qualification, only for purposes of today?

20                MR. GELFAND:  No objection.  We covered that in --

21                THE COURT:  I thought we did too.

22                     VOIR DIRE EXAMINATION

23    BY MS. BONJEAN:

24    Q     Dr. Shane can we just please identify for the record the

25    document I just handed you?

1  A    Yes.  This is my current curriculum vitae, which outlines

2  my academic qualifications.

3           MS. BONJEAN:  Your Honor, the only issue that I

4  have --

5           THE COURT:  Bring it up.  I know what you're going

6  to say.

7           MS. BONJEAN: -- is that I expect an appeal --

8           THE COURT:  I know.

9           MS. BONJEAN:  -- and I am not going to belabor the

10  point, but I do have to make enough of a record for the

11  purposes of an appeal.  So I apologize.

12           THE COURT:  It's not that we don't want to hear

13  about your qualifications, Dr. Shane, we just want to get to

14  your opinion.

15  BY MS. BONJEAN:

16  Q    Dr. Shane, where do you presently work?

17  A    John Jay College of Criminal Justice in New York City.

18  Q    What is your current position?

19  A    Associate professor.

20  Q    And how long have you worked at John Jay?

21  A    Since February of 2009.

22  Q    Dr. Shane, were you ever a police officer?

23  A    Yes.

24  Q    For how long?

25  A    From 1989 to 2005 when I retired from Newark, New Jersey.

1    Q     And what was your highest rank when you retired from the

2    Newark Police Department?

3    A     Captain.

4    Q     Now, Dr. Shane, you identified and I marked your CV, I'm

5    not going to go through it.  But I'd like to ask you a few

6    questions about your experience as it relates to your

7    testimony today.  Can you please just summarize for the Court

8    your experience with conducting statistical analysis?

9    A     I teach a course, a graduate level course on statistics

10   at John Jay College.  The official title is called Using

11   Computers in Social Science.  It's identified as CRJ 716, as

12   the university terms it.  So it deals with an added level of

13   statistical analysis beyond the introductory course that you

14   get when you're an undergraduate.

15         I've conducted several scientific publications in

16   policing and elsewhere using those very methods that I teach.

17   Q     Specifically, have you published any articles that

18   memorialize your statistical studies?

19   A     Yes, I have.  In peer review journals.

20   Q     What is a peer review journal, briefly?

21   A     A peer review journal is a double blind referee journal

22   where the author submits to the journal, who then submits to

23   the professionals in the field with relevant experience so

24   either the author knows the reviewer and the reviewer does not

25   know who the author is who assessed the validity and

Shane - Direct                                                    38

1    professionalism of the document.

2              If they agree, than they return to the journal and

3    say that this article is fit for publication.

4    Q    And can you just tell the Court what your last article

5    was that you published?

6    A    The last article I published was a paper on maritime

7    piracy that uses the types of analyses that we've been talking

8    about using in this case.

9    Q    Statistical analysis?

10   A    Yes.  That's correct.

11   Q    Okay.  And was that a peer reviewed journal?

12   A    Yes, it is.

13   Q    And where was it published?

14   A    Justice Quarterly.  Which is one of the top tier journals

15   in criminal justice.

16             MS. BONJEAN:  Your Honor, just for the record's sake

17   we're not going to go through the article, but I'd like to

18   attach it to the record, since it does deal with the same --

19             THE COURT:  No objection.

20                          DIRECT EXAMINATION

21   BY MS. BONJEAN:

22   Q    Dr. Shane, I'm handing you what I've previously marked as

23   plaintiff's Exhibit D, as in dog.  Can you please identify

24   that for the record?

25   A    Yes.  This is the article on maritime piracy that I

Shane - Direct                                    39

1    published in <u>Justice Quarterly</u>.

2    Q    Okay.  Dr. Shane, during your employment with the Newark

3    Police Department did you have any experience with creating or

4    implementing Internal Affairs policy?

5    A    Yes, I did.

6    Q    Can you explain to the Court briefly what that experience

7    was?

8    A    I was in the policy and planning division at several

9    different levels, from detective, sergeant, lieutenant to

10   where I was the commanding officer as a captain, and the

11   policy and planning division is the administrative arm of the

12   police director, so working directly for the police director

13   and the chief of police, it is my responsibility to both

14   draft, revise and promulgate a work product throughout the

15   department.

16           So in your example, Internal Affairs is one of the

17   things that I would have had to have looked at.

18   Q    Do you have an intimate knowledge of how Internal Affairs

19   works, at least with respect to the Newark Police Department?

20   A    Yes, I do.

21   Q    And are you familiar with national norms and state norms

22   regarding Internal Affairs policy?

23   A    Yes, I am.

24   Q    Now, Dr. Shane, when were you retained by me with respect

25   to this litigation?

Shane - Direct                                                40

1    A    I don't know the exact date, probably somewhere over the

2    summer of this year, at least around August about, somewhere

3    around there.

4    Q    And what was your understanding of why you were being

5    retained?

6    A    To produce a report that helped identify patterns and

7    practices with respect to Internal Affairs investigations in

8    the Atlantic City Police Department.

9    Q    And did I -- strike that.  Is it fair to say that before

10   conducting a study, you have to compile data?

11   A    An empirical study, yes.

12   Q    And why is that?

13   A    Because it is the data that holds the answers to what it

14   is you're trying to solve.

15   Q    Did you in fact prepare a report for the purposes of this

16   litigation identifying how to collect data in the quest that I

17   had tasked you with?

18   A    Yes, I did.

19   Q    I'm going to hand you what has been previously marked as

20   Plaintiff's Exhibit B and C, and ask that you identify them

21   for the record?

22   A    Yes, these are two reports that I prepared on August

23   17th, 2014.  The first report is titled Atlantic City Police

24   Department Internal Affairs Data Elements.  And the second is

25   a sampling methodology and a rationale for the Atlantic City

1    Police Department Internal Affairs cases.  So the first one on

2    Internal Affairs data elements are the types of data that you

3    are talking about.

4              These are the data elements that you would need to

5    collect in order to produce some sort of empirical analysis.

6    And the second one deals with the sampling methodology on how

7    we would draw a representative sample of those cases.

8    Q    Now in preparing these reports, in specific, Dr. Shane,

9    were you asked to layout every hypothesis that would be tested

10   in this study?

11   A    No.

12   Q    And were these reports intended to identify every

13   variable that might be tested in an analysis?

14   A    No.

15   Q    Okay.  What were the purposes of these specific reports?

16   A    To give the reader an understanding of what types of

17   things we would be looking at, not to disclose the strategy,

18   of course, but the types of data elements that we would want

19   to capture that we can use to draw inferences, draw

20   relationships, draw correlations between specifically things

21   like dispositions, types of sentences, whether or not

22   complainants and officers differed in age, race, gender,

23   controlling for things like the assignment that an officer is

24   working, or whether they're in uniform or out of uniform, on

25   duty or off duty, things like that.

1    Q    So, for instance, if an officer was doing a special

2    employment detail, versus doing a assignment in the tactical

3    unit, that would be a variable that had to do with assignment,

4    correct?

5    A    That's correct.

6    Q    And we would want -- in order to do a reliable analysis,

7    we want to know what type of assignment an officer might have?

8    A    That's correct.

9    Q    Okay.  Is the size of the sample or the randomness of the

10   sample predicated on any specific hypothesis?

11   A    No.

12   Q    Is the sample predicated on the type of statistical tests

13   that might be used?

14   A    Yes.

15   Q    Okay.  Now what is the primary consideration when you're

16   conducting a study of this nature?

17   A    Well any empirical study, the primary consideration is

18   the size of the sample.  If you don't have an adequate sample

19   size, the inferences that you draw are not going to be very

20   meaningful.

21   Q    And what -- how do you determine in the necessary amount

22   of data to collect, so that you can measure certain effects in

23   a study?

24   A    You conduct what is known as a power analysis.  And power

25   is a term that is used in the sciences to refer to the

Shane - Direct                                              43

1   adequacy of the sample to derive the effects that you are

2   looking for, if they are in fact present.

3   Q    Now did you come up with this idea of power analysis, or

4   statistical analysis?

5   A    No, it's not my idea.  No.

6   Q    And is this something that -- is this concept something

7   that has been in the literature in social science work for any

8   number of years?

9   A    A very, very long time.  In fact, Cohen, who is the

10  author of an influential book in 1988 that deals with

11  statistical power, is considered one of the fathers of

12  statistical power analysis, and he's been a -- long been a

13  leader in -- as a statistician in the sciences.

14  Q    And it's his model that you are employing for the

15  purposes of this -- your analysis in these reports, correct?

16  A    That's correct.  Yes.

17  Q    Now in your report you identify several statistical tests

18  that could be employed in your eventual analysis, isn't that

19  right?

20  A    Yes, I do.

21  Q    And I believe one of those tests identified was multiple

22  regression, correct?

23  A    Yes.  That's correct.

24  Q    And tell me -- or tell the Court just generally what

25  multiple regression statistical test is and what it does?

Shane - Direct                                              44

1    A    So multiple regression is a form of prediction, so you're

2    able to predict a particular outcome variable, or a particular

3    dependent variable based on a series of what are known as

4    independent variables, controlling for other influences.

5              So if you, for example, wanted to predict the

6    outcome of an officer having a case sustained or not sustained

7    from their assignment, whether they were on duty or off duty,

8    whether they were in uniform or out of uniform, or special

9    detail or a patrol related detail, you could make that using a

10   model called logistic regression, which is a form of multiple

11   regression analysis.

12   Q    And is that the type of statistical test that you'd

13   expect you would employ in the eventual analysis of this data?

14   A    Yes.

15   Q    Is it possible to use one or more than one statistical

16   test in any given study?

17   A    Yes.

18   Q    Okay.  Is it fair to say that the purpose of conducting a

19   statistical analysis is to be able to draw reliable

20   statistical predictions?

21   A    Yes.

22   Q    And to draw inferences from those predictions, or from

23   those findings?

24   A    Yes.  And the hope is that you will draw an inference to

25   the wider population from the sample that you have.

1    Q    So in order to draw reliable inferences, or reliable

2    conclusions, how important is it to have a sample size, or a

3    sample -- a high sample -- or, excuse me, strike that.   How

4    important is it to have a large enough sample size?

5    A    It's terribly important.   If the study is underpowered as

6    we would call it in sciences, you can't make any meaningful

7    inferences, and it's of no value.

8    Q    And just to be clear, in the context of this litigation

9    and what I've asked you to study, the sample that we want to

10   look at is Internal Affairs cases, correct?

11   A    Yes, that's correct.

12   Q    That is the data.   Or the data's contained in those

13   Internal Affairs cases, correct?

14   A    Correct.   The individual data elements are contained in

15   the files.   The what we call in social science the unit of

16   analysis is the individual case.   That's what's under

17   examination.

18   Q    So just in shorthand, to draw a reliable sample

19   statistical inference from a study, we need to make sure

20   there's enough data there for the study, correct?

21   A    That's correct.

22   Q    Now let's talk about --

23   A    And may I add to that?

24   Q    Yes.

25   A    So it's not necessarily the total number of cases you

1    have, it's whether or not those cases are complete.  So for

2    example, if we were talking about having a thousand cases, and

3    I know that we said here there's 721, embedded in there are --

4    is very likely going to be missing data.

5          There's not -- every single case file is not going

6    to have every single variable.  So what happens is, to draw

7    more reliable parameter estimates, the statistical software

8    that is used typically deletes those cases that have missing

9    cases.  You get a concurrent downturn in power when that

10   happens.  So if just by -- just to make the math easy, if we

11   had drawn 10 cases, and there were -- let's say there were

12   three different variables in there, age, sex and race.

13         If age was missing in one, and race was missing in

14   another, and sex was missing in another, those three cases

15   would be deleted out of the ten.  So you have seven full cases

16   to work with.

17         And the reason that that is done, it's called

18   listwise deletion, and it happens to get more reliable

19   parameter estimates.  Because you don't want to start to make

20   estimates on missing data.

21   Q    And have you ever confronted this issue in doing

22   statistical analysis previously?

23   A    Yes, I have.

24   Q    And can you just give the Court maybe one example of how

25   this works, in -- one example of personal experience you've

1    had dealing with this?

2    A    So in the maritime piracy paper that I wrote, we started

3    out with an -- can I refer to this?

4         I started out with 4,638 cases of maritime piracy.

5    And in the end, when I conducted a logistic regression model,

6    which is shown on Table 3, page 15 of the article, I wound up

7    with 2,132 cases that were used that were complete cases for

8    the logistic regression analysis.

9         So it's a downturn of about -- over 50 percent.

10   Q    So over 50 percent of the cases had to --

11   A    They were deleted.

12   Q    -- were deleted, and they were never even considered as

13   part of the analysis, because they missed data, correct?

14   A    That's correct.

15        THE COURT:  So you're saying that if you get 721

16   files, ultimately maybe you'll only be able to use three or

17   400 because the rest of them are incomplete?

18        THE WITNESS:  That's correct.  At some point, Your

19   Honor, a variable in that file will be missing, and it will be

20   deleted from the analysis.  That's correct.  Through a process

21   known as listwise deletion.

22   BY MS. BONJEAN:

23   Q    In a perfect world, how many Internal Affairs cases would

24   we want to study to derive the most reliable conclusions?

25   A    Well if you had -- if you had your pick, so to speak, you

1   would like to have a population of cases, all the cases.

2   Q     And in this case the population would be all Internal

3   Affairs cases, correct?

4   A     Correct.

5   Q     And that would produce the most reliable results?

6   A     That's correct.  Because now we're not drawing inferences

7   from a sample, we're drawing inferences from the entire group.

8   Q     And --

9           THE COURT:  Can I ask one question?  What does it

10  tell you if there are -- there is a substantial proportion of

11  the files that are missing information, does that tell you

12  anything?

13          THE WITNESS:  If we had the -- let me -- I want to

14  make sure I'm clear.  If we had the population of cases, and

15  in that population of cases there's missing data, which brings

16  our power down, is that --

17          THE COURT:  Suppose you get ten files, and eight or

18  nine of them are missing the -- some or all of the data you're

19  looking for, does that in and of itself tell you anything?

20          THE WITNESS:  Well it would -- you would have to

21  look at your power analysis to tell you where you're going to

22  fall below.  So let's just hypothetically say that -- let's

23  say our power analysis suggested we needed 10 cases.  And the

24  population of cases that we could draw from were 20 cases.

25          And we only got seven cases because of all the

1    missing data out of the 20, I would fall below the ten that I

2    needed.  And the answer is yes, then it would be an

3    underpowered study.

4              THE COURT:  That's not what I'm asking.

5              MS. BONJEAN:  I understand the Court's question.

6              THE COURT:  What I'm asking is this.  Suppose you

7    identify three key factors, these are the three most important

8    things that every IA file should have.  And you review ten

9    files and nine of them don't have one, two or three of those

10   three factors, does that tell you anything?

11             THE WITNESS:  You're not going to be able to draw

12   reliable inference from --

13             MS. BONJEAN:  No.  I understand the Court's

14   question.

15   BY MS. BONJEAN:

16   Q    Is there a way for us to test -- let me put this in a

17   different context.  Let's say our theory is that Internal

18   Affairs is not taking statements from any complainants, okay?

19   A    Okay.

20   Q    And part of the failure in the Internal Affairs process

21   is they have -- and this is just hypothetically, they are not

22   interviewing the complainants in the cases.  So, naturally,

23   you're going to have the files don't have a complainant's

24   statement.

25   A    Okay.

1    Q    Is there a way for us to test whether or not this in and

2    of itself is a failure in the Internal Affairs process?

3    A    Thank you.  I misunderstand you, Judge.

4            THE COURT:  I think you were thinking in

5    statistician --

6            THE WITNESS:  Thinking statistically.

7            THE COURT:  -- line.

8            THE WITNESS:  Yeah.  I'm going back to the police

9    hat.

10           MS. BONJEAN:  Put the cop hat on for a second.

11           THE WITNESS:  Okay.  Yes.  The answer to that

12   question is, you would measure against the Attorney General's

13   guidelines.  And the Attorney General's guidelines would

14   dictate that you should have those things.  And if you had

15   zero and the guideline said that you should have them, then

16   that's not congruent with what you should be doing.

17   BY MS. BONJEAN:

18   Q    And that's not necessarily just -- you don't need

19   necessarily the multi-regression test to do that type of

20   analysis, correct?

21   A    No, you can use what are called descriptive statistics to

22   do that.

23   Q    Okay.  So the data that we're looking at, it can have

24   many purposes.  We can draw statistical conclusions from it,

25   correct?

1    A    Yes.

2    Q    And we can also draw conclusions by looking -- I would

3    say more qualitative conclusions, correct?

4    A    Yeah.  I think what you're tapping are called process

5    indicators.  It's a process measure, that this is an aspect of

6    process that should have happened that did not happen.

7    Q    Correct.  And when we say should have happened, where

8    would you draw that information?

9    A    From a standard, which would be the Attorney General's

10   guidelines.

11   Q    So you can take the Attorney General guidelines and see

12   what should have been done, right?

13   A    We can map to that -- as to standard, yes.

14   Q    And then you can compare as to against to what was done

15   in these number of cases, correct?

16   A    Yes.  You could do that.

17   Q    And from that you can draw some inference, correct?

18   A    Yes, you can do that.

19   Q    Okay.  Is -- can you explain to the Court what a sampling

20   error is and how that intersects with -- does the sampling

21   error have to do with just incomplete files?  Or is the

22   sampling error -- what is a sampling error?

23   A    Well a sampling error occurs when you draw only a portion

24   of the sample, instead of having the entire population.

25   There's always some sort of error that's going to be present.

1    So, for example, maybe you didn't draw the representativeness

2    that you were looking for.

3              There were -- males were over included females were

4    under included, something like that.

5    Q    So let me ask you this, from a social scientist

6    standpoint, if we were to look at Internal Affairs officers

7    for only one officer, would that produce potentially a

8    sampling error?

9    A    Well that's completely biased.  You're -- let me just

10   make sure I'm clear.  You're saying that if I selected a given

11   officer in any police department and examined that officer's

12   Internal Affairs record, and I drew inferences about that

13   officer's record for the entire Internal Affairs process in

14   the Police Department?

15   Q    Correct.

16   A    No, you can't do that.

17   Q    Is there any basis in social science that would justify

18   that type of approach?

19   A    No.  That's completely biased.

20   Q    Now you mention in your report a stratified random

21   sample.  That's a term you use.

22   A    Yes.

23   Q    What is a stratified random sample?

24   A    So what you do with your population of cases is break it

25   into what are called strata, different groups.  Now you could

1    subgroup by male, female, location, whatever the strata is

2    that you are breaking it down by.

3             To -- and then from that strata that you break down,

4    you sample individually from -- you take random samples from

5    each of those strata.  So compared to, if you just lumped all

6    the cases together and started to draw a random sample,

7    because then you might over sample for 2010 instead of 2005,

8    or 2007 instead of 2008, something like that.

9    Q    Very good.  So you wouldn't want to just take the last

10   721 cases?

11   A    No, no, no.  That's not a random sample.

12   Q    Okay.  Earlier we talked about a couple of different

13   types of statistical tests that might be used in your

14   analysis, correct?

15   A    Yes.

16   Q    And you testified that this multiple regression is a

17   technique used for predicting the unknown value of a variable

18   from the known value of two or more variables, is that fair?

19   A    That's correct.

20   Q    Okay.  Can you provide a concrete example for the Court

21   so that us non-science people can understand what is meant by

22   that?

23   A    Well let's say for example we were using disposition, and

24   we wanted to find out whether cases were exonerated or

25   sustained.  Those are the only two outcomes you have, right?

Shane - Direct                                          54

1   Either exonerated or -- well let me rephrase that.

2            Sustained and not sustained.  Where not sustained

3   included a variety of dispositions other than sustained.  We

4   could make predictions about how likely that would be if we

5   had a series of independent variables such as age, race, sex,

6   time on the Police Department, assignment, things like that.

7   And we would be able to say with statistical certainty that

8   this disposition, let's just say it was sustained findings,

9   did or did not occur by chance alone.

10  Q    Okay.  Now you heard opposing counsel say that in your

11  report you identify 44 different variables that dictated what

12  your ultimate number was, and I just want to address this.

13  We'll go back to it.  But that's not accurate, correct?

14  A    That's not accurate.

15  Q    Okay.  You identified four Internal Affairs data elements

16  that theoretically could be culled from this data, correct?

17  A    That's the universe of variables that we would draw from

18  to make the inferences that we're looking to make.

19           THE COURT:  I think counsel said four.  She meant 44

20  in the prior question?  Just so I'm not confused.

21           MS. BONJEAN:  I thought he said 44 --

22           THE COURT:  When you repeated the number back to him

23  you said four, but I think you meant 44.

24           MS. BONJEAN:  Correct, I meant -- 44 is not correct,

25  correct?  Well strike that.

1   BY MS. BONJEAN:

2   Q    Actually, how many variables did you consider when you

3   derived your 721 number, and we'll go through that in a little

4   more detail, but just if you can tell the Court?

5   A    Okay.  So when you when you create a power analysis model

6   you have to supply four different parameters.  One of those

7   parameters are called the independent variables.  The things

8   that you believe are related to the dependent variable that

9   will cause some sort of effect on that.

10              I selected seven.  And it's by reasonable convention

11  I selected seven.  That could go up or down.  But that number,

12  as it goes up or down, will raise or lower the total number of

13  cases.

14  Q    So you don't know exactly what you're testing quite yet?

15  I mean, we know generally what you're testing, right?

16  A    That's correct.

17  Q    So you picked a number that was a safe number, correct?

18  A    A reasonable number.

19  Q    A reasonable number.

20  A    Yes.

21  Q    And it wasn't 44?

22  A    No.

23  Q    If it was 44 --

24  A    Seven.

25  Q    -- how much higher -- that number would be a lot higher,

1   wouldn't it?

2   A    It would be in the thousands I -- I'm estimating it would

3   be in the thousands.

4   Q    Okay.  You actually picked seven to reach your

5   conclusion, correct?

6   A    Correct.

7   Q    And you picked seven because that is reasonable in this

8   type of analysis that you have experience in, correct?

9   A    Yes.  And getting -- and getting to this point where

10  we're making some generalizations and some estimates on the

11  size of the power, seven is reasonable.

12  Q    Okay.  I'd like to draw your attention specifically to

13  that chart that you just did mention, which is how you

14  actually derived the 721 number.

15  A    That's on page four of the methodology report, Table 2.

16  Q    And this is your power analysis, correct?

17  A    That's correct.

18  Q    And there are four parameters that you look at, correct?

19  A    That's correct.

20  Q    And the first parameter that you consider is the

21  anticipated effect size, correct?

22  A    That's correct.

23  Q    And briefly, what is that -- what do you mean by

24  anticipated effect size?

25  A    So that is the magnitude of the relationship that you are

Shane - Direct                                                    57

1    looking to find.  The strength of the relationship.  So if

2    there is something present, if there is actually an effect

3    present, you would want to try to detect it at lower levels

4    than higher levels, because that would give you the ability to

5    intervene earlier in a correction process, a supervision

6    issue, to make improvements somewhere, something like that.

7            So if I know about it down here at the lower level,

8    I can actually say that something is occurring, rather than

9    have to get all the way up to a higher effect before I find

10   anything.

11   Q    And you chose a relatively low anticipated effect size,

12   fair to say?

13   A    Yes, I did.

14   Q    And why did you do that?

15   A    Well in an effort to boost the sample size, because -- a

16   couple of things.  First of all, the litigation that is --

17   that is about to proceed is far too important to let a small

18   effect go.

19           We're not talking about identifying the color of the

20   police car that Atlantic City is looking for, whether it be

21   blue or white, we're talking about something that is a First

22   Amendment issue in redressing Internal Affairs complaints.

23   That's much more --

24           THE COURT:  I think it's the Fourth Amendment.

25           THE WITNESS:  First amendment?  Right to redress

Shane - Direct                                          58

1    Government?

2    BY MS. BONJEAN:

3    Q    He's -- well both constitutional, the right to -- the

4    right to hold Government accountable, which is I guess a First

5    Amendment right, but also the Fourth Amendment right, of

6    course, is what --

7    A    Okay.

8    Q    But --

9    A    I'll defer to the Judge, certainly on that.

10          THE COURT:  Okay.

11   BY MS. BONJEAN:

12   Q    I think we were speaking about the right for citizens to

13   hold Government accountable for their law enforcement,

14   correct, is that what you mean by that?

15   A    The right to redress Government embedded in the First

16   Amendment is operationalized as Internal Affairs in Police

17   Departments.

18   Q    I see.

19   A    Yeah.

20   Q    And what other reason might you have chosen a small

21   effect size?

22   A    To be able to bring into the public discourse some of the

23   things that may be happening.  And it's in the best interest

24   of Atlantic City and the supervisors in the Police Department

25   to know that there may be something happening, even if it is a

1    -- even if it's only a small effect, that there is some sort

2    of relationship between, you know, two things that are

3    happening that we would want to know about so we can make

4    corrections.

5    Q    Okay.  The effect size, you could bump that up if you

6    wanted to, I suppose, correct?

7    A    Yes, you can.

8    Q    Okay.  But you were --

9    A    At which time you will lower the number of cases you

10   need.

11   Q    But when you were asked to do this task, you chose an

12   effect size that you thought was an appropriate effect size

13   given the task involved?

14   A    And I erred on the side of caution on a larger sample,

15   which is always better, because you don't get a second bite at

16   the apple.  You can't go back to Atlantic City Police

17   Department and say, we made a mistake, we need, you know,

18   another 700 cases, because you've only given us 32 -- or 50,

19   or whatever it may be.

20   Q    Right.

21   A    So it's better to err on the side of caution than to not

22   have enough data and say, well, what do we draw from this?

23   Q    This is -- one consideration was, we get one shot at the

24   apple here, correct?

25   A    That's correct.

1    Q     One bite at the apple?

2    A     That's correct.

3    Q     Okay.  Now you also talked about desired power level.

4    What is desired power level?

5    A     Okay.  So at the .8 power level, which is by statistical

6    convention, what we're saying there is that 80 percent of time

7    we would like to detect an effect, if one is statistically

8    significant and present, 80 percent of the time.  Which means

9    also 20 percent of the time when there was an effect present,

10   you will not detect it.

11         And that's because we're dealing in probabilities,

12   we're not dealing in absolutes.  So you set the power level a

13   bit higher to be able to have 80 percent of the effect

14   detected, if there is a significant result.

15   Q     And this is conventional in the scientific community, or

16   social science community?

17   A     Yes, it is.

18   Q     And doing a separate analysis?

19   A     Yes.

20   Q     This isn't a number that you just drew out of thin air,

21   correct?

22   A     No.  No.

23   Q     Now we talked a little bit about the number of

24   predictors, which is the third parameter.  Is it fair to say

25   that predictors are independent variables?

1    A    Yes, they are.  Same terminologies.

2    Q    And you actually chose seven independent predictors,

3    correct?

4    A    I did, yes.

5    Q    And we discussed that that wasn't -- that to some degree

6    it's random, but is a reasonable number that you thought was

7    appropriate, correct?

8    A    Yes.

9              THE COURT:  Did you identify what the seven are?

10             THE WITNESS:  No.

11             THE COURT:  Can you do that?  What are they?

12             THE WITNESS:  We don't --

13             THE COURT:  You don't know yet?

14             THE WITNESS:  No, we don't know yet.

15             THE COURT:  Okay.

16             THE WITNESS:  But they would be -- hypothetically,

17   they would be things like age, race, sex, assignment --

18             THE COURT:  Is that what you would be looking at

19   here, though?

20             THE WITNESS:  Well if we were trying to make a

21   relationship between something to say, for example, that age

22   or race predicts the outcome of a complaint, and that there's

23   a pattern that develops in that way, yes.

24   BY MS. BONJEAN:

25   Q    If we were doing that.  In this case, if race is not a

1    component we wouldn't necessarily test for that, correct?

2    A    No, you don't have to.

3    Q    Right.  But for instance, if we are testing dispositions,

4    okay, and a correlation between --

5              MS. BONJEAN:  Well let me think of a good

6    hypothetical, and I will circle back around, Your Honor.

7    BY MS. BONJEAN:

8    Q    But the point is, is that when you're arriving at this

9    number, you have to pick some number of independent variables,

10   correct?

11   A    You have to pick some reasonable to establish your study.

12   Q    Right.  Correct.  That's how you -- that's how you get to

13   that number?

14   A    That's correct.

15   Q    Okay.  The next parameter --

16             THE COURT:  Can I clarify something here?

17             MS. BONJEAN:  Sure.

18             THE COURT:  Because I -- I really want to get to the

19   crux of -- as you sit here today, assuming you get 100 files,

20   are you saying there are seven things in each of those files

21   you will look for?

22             THE WITNESS:  There could be more, there could be

23   less.

24             THE COURT:  Do you know what, as you sit here now,

25   do you know what you're going to be looking for in this case?

1            THE WITNESS:  Not specifically, no.

2            THE COURT:  But what do you need to know to decide

3      what those variables are that you're going to look at?

4            THE WITNESS:  Well I would need to know Ms.

5      Bonjean's trial strategy.  I need to know what questions that

6      she's trying to answer.  What research questions that she

7      wants answered in order to formulate some sort of a --

8            THE COURT:  You don't know that now?

9            THE WITNESS:  I don't think I know it entirely. no.

10     BY MS. BONJEAN:

11     Q    Well you know -- you know what our -- well let me ask you

12     this.

13     A    I know what our theory of the case is.

14     Q    Okay.  What my theory of the case is --

15           MS. BONJEAN:  I think, Your Honor -- let me ask it

16     this way.

17     BY MS. BONJEAN:

18     Q    Do you know the specific scientific questions, hypotheses

19     that -- we've talked about certain hypotheses we might look

20     at, correct?

21     A    Yes.

22     Q    For instance, might we want to look and see whether

23     certain officers have an exponential number of Internal

24     Affairs complaints made against them?

25     A    Yes.

1   Q    That's one thing.  And let me just back up.  One aspect

2   of what you've been asked to do is conduct a statistical

3   analysis, correct?

4   A    Correct.

5   Q    But you're also being asked to look at qualitatively what

6   the investigation process, correct?

7   A    Correct.

8   Q    And that doesn't necessarily implicate statistics, right?

9   A    That's correct.

10  Q    But you still have to have an appropriate sample size,

11  correct?

12  A    That's correct.

13  Q    If I just pulled ten cases and had you look at them, and

14  -- you wouldn't be able to make fair conclusions from just

15  those ten cases, correct?

16  A    That's correct.

17  Q    You have to have a greater number of cases from which to

18  draw an inference, right?

19  A    That's correct.

20  Q    So one aspect is comparing what is being done in the

21  Internal Affairs process against what the Attorney General

22  guidelines is -- it has been dictated as a national or state

23  norm, right?

24  A    Yes.  That's correct.

25  Q    And that's one aspect of what you're being asked to do?

1    A    Yes.

2    Q    You still have to have enough cases to do that, correct?

3    A    Yes.

4    Q    And how many case -- do you think that number could be

5    less than 721 to do that type of analysis?

6    A    Yeah, sure,  It could be, yes.

7    Q    And would you be flexible on what that -- I mean, would

8    it still be scientifically reliable if the number was less

9    than 721?

10   A    Well what we would do then is, we would adjust these

11   parameters to make the statistical inferences.  But for the

12   process evaluation, it could be lower.

13   Q    Okay.  So what you're saying is, if you're doing a

14   process evaluation, which is actually looking at the files,

15   and determining what has gone down in each Internal Affairs

16   file, correct?

17   A    Yes.

18   Q    And then comparing it as to national or state norms, you

19   could draw fair inference on a number of cases that is less

20   than 721?

21   A    I think the answer's yes.

22   Q    Okay.  But in terms of drawing statistical data, where if

23   I wanted to say to this jury, in cases in which officers were

24   on special employment detail, there was a .0001 percent that

25   any complaint would be sustained, you would need to do a

1   statistical study, right?

2   A    Yeah, you would have to do a statistical study to make it

3   scientifically rigorous, to draw that inference.

4   Q    And if I wanted to make that type of argument to the

5   jury, assuming that's what the evidence that bore out, or this

6   analysis, how many independent variables would you need for --

7   with that as a hypothetical?

8   A    Seven to ten.

9   Q    So even with that one conclusion of officers on special

10  employment details had Internal Affairs complaints filed

11  against them at this particular rate, which is higher than the

12  average patrol officer, and those were never sustained, or

13  sustained at .001 percent, whatever -- whatever the numbers

14  are, you would still need about seven independent variables to

15  make that conclusion, correct?

16  A    Yes.  Because you want to be able to control for other

17  influences that may be impacting on that.

18  Q    Exactly.  And this number of predictors, it's more

19  complicated than perhaps some of us understand -- I include

20  myself.  Your number of predictors also includes variables

21  that you're controlling for, right?

22  A    That's right.  You're -- a controlling variable means

23  that you -- holding all else constant, you still get this

24  finding.

25  Q    So that the finding is more reliable?

Shane - Direct                                                67

1    A    That's correct.

2    Q    So that if I make a particular argument that to -- to a

3    jury that, you know what, these special employment detail

4    officers are out of control, they are never disciplined, they

5    -- the Police Department doesn't discipline them, the clubs

6    don't discipline them.  They're policing tourists, and yet

7    there's Internal Affairs complaints against them that, I'm not

8    even commensurate with a different, you know, a population

9    where there's higher crime, for instance.  I want to be able

10   to -- I want to be able to say in response to the argument

11   that, oh, you know, no that's because of X, Y and Z.  We want

12   to control for certain things to make that argument more

13   reliable, that's an example, correct?

14   A    Well and just to bring it down more locally, if you will,

15   maybe after controlling for assignment, we find out that it's

16   a wash.  Whereas it looks like all the narcotics officers are

17   being targeted for Internal Affairs complaints.  But after we

18   control for the types of training they received, the number of

19   years on the Police Department, the types of investigations

20   that they are conducting, that's three right -- three

21   independent variables right there, we find that we have no

22   effect.

23   Q    Right.

24   A    So in that by very relationship that found something

25   after we control for those other things, we dismiss the notion

1    that there is anything to it.

2    Q    So we're not just saying seven predictors because we're

3    looking at seven things?  We might be looking at one thing,

4    but we need to control and that --

5    A    For six others.

6    Q    Correct.

7    A    Correct.

8    Q    And that's why you reached this somewhat arbitrary number

9    of seven, but a reasonable number in your estimation?

10   A    Correct.

11   Q    Okay.  Now briefly, and I won't have much more after

12   this, but I want to talk you through specifically the process

13   of actually collecting the data.  You had some experience in

14   Internal Affairs, correct?

15   A    I do.

16   Q    And can you explain to the Court, based on your

17   experience in creating and implementing policy, Internal

18   Affairs policy in a Police Department, and how -- well first

19   let me ask you this, is Newark Police Department a larger

20   Police Department than Atlantic City?

21   A    Yes, it is.

22   Q    Okay.  And based on your experience, how would you go

23   about actually collecting this 721 cases in a fair way?

24   A    Well someone from inside Internal Affairs, whether it be

25   a member of the agency, or a civilian working there, would --

1   after we've identified the cases --

2   Q     Yeah.  First explain to the Court how you identify the

3   cases.

4   A     Well first we're going to have to identify what the

5   population is, so let's just -- and I'll use what I've written

6   here in my report, which appears on Table 3, page 8.  So let's

7   say, for example, we have from 2003 to 2013, we would figure

8   out how many total cases in each year sum up to a given number

9   for all those years --

10  Q     And let me stop you right there.  In your experience, how

11  would you determine how many cases there were?

12  A     Well there's a master index that you would keep in

13  Internal Affairs.

14  Q     And is that a national or state norm to have a master

15  index?

16  A     It's both.

17  Q     Okay.  You -- a Police Department who is abiding by

18  Attorney General guidelines for state and national norms would

19  have a master index, correct?

20  A     Yes.  They should.

21  Q     Okay.  Go ahead.

22  A     Okay.  So from that index you would identify each strata.

23  So each year you would have a given number of cases that came

24  in for that year.  And based on your power analysis, now using

25  this example of 721, you would divide that by 2002, and you

1   would get 36 percent.

2             And what you would do then is draw 36 percent of the

3   cases from each year, okay?

4   Q    And how would you do that logistically?

5   A    Now -- well the -- first you would identify that you're

6   going to draw those 36 cases.  Then what you do is you take

7   the total number of cases in a given year, multiply that by

8   .36 to get the number of cases that you actually pull for that

9   year.

10  Q    Oh, I see.  Okay.

11  A    Now let's say the total number of cases in a given year

12  is 129.  You use a table of what are called random numbers to

13  generate between one and 129.  It generates a table that are

14  completely random numbers, and that table that I've created

15  appears on page nine, which is Table 4 of this example.

16            From there -- now you've got the table, you've got

17  the table of random numbers in front of you.

18  A    Yes.

19  Q    You know how many cases you have each year, you know how

20  many you're going to pull from each year.  You blindly select

21  a given number by just looking away from the paper and

22  literally point to it and taking a number.

23            In this case I did it and it started at K-12.  In

24  cell K-12 is case number 45.  From case number 45, you then

25  move to the right-hand side and you pick up all the cases to

Shane - Direct                                          71

1   the end of that row, come down to the next row after that,

2   which is row L, and go all the way across, eliminating any

3   duplicates, until you get to 46 cases, which is the number you

4   need to draw for that given year.

5          You repeat that for every single year until you get

6   to 721.  And then someone in Internal Affairs literally goes

7   to the file, after we've identified these cases, and says I

8   need case number 45, 119, 23, 44 in year 2003.  And then they

9   repeat that for all those different years.

10         You now have a systematic simple random sample

11  stratified by year, and that gives every case in the

12  population an equal chance of being included so there's no

13  bias.

14  Q    And this can be done simply from the index card to start,

15  right?

16  A    That's where you would begin.

17  Q    You identify the cases from the index card, the master

18  index log, right?

19  A    Yes.

20  Q    And then you would submit a request to the Internal

21  Affairs Department, or I would, and say these are the ones

22  that we're -- and is it possible that we could do this -- you

23  could actually do this with both sides present, right?

24  A    What do you mean?

25  Q    Let me strike that.  Is that something that you and I

Shane - Direct                                    72

1   need to do -- this is something that could be done in a public

2   sort of fashion, actually picking the random sample, correct?

3   A    Yeah, sure.  There's no secret to it.

4              THE COURT:  The master index log that you're talking

5   about, are you assuming that January 1st, 2015 there's an IA

6   complaint, that's number one against Officer X?

7              THE WITNESS:  That's correct.

8              THE COURT:  The next day there's a complaint against

9   Officer Y, that's number two.

10             THE WITNESS:  That's correct.

11             THE COURT:  Okay.  And that's different than the

12  individual index cards for each officer, right?

13             THE WITNESS:  That's correct.

14             THE COURT:  Okay.  And is it your opinion that good

15  practice is to have such a master log?

16             THE WITNESS:  I think it's required by Attorney

17  General guidelines.  You have to have it.

18             THE COURT:  Do we know if that exists?

19             MR. GELFAND:  We have it.  I mean, I have it in my

20  hands going back five years, but it exists going back further

21  than that.

22             THE COURT:  Terrific.

23  BY MS. BONJEAN:

24  Q    So basically, we could identify the cases in a -- in a --

25  what I call public forum, but with both attorneys present.

Shane - Cross (Gel)                              73

1    And from there we would simply request the cases, correct?

2    A    That's perfectly acceptable.

3    Q    And then somebody would just copy the cases, right?

4    A    That's how it would be done, yes.  You'd get the case

5    file out of the filing cabinet, you'd open it up, you'd

6    photocopy the pages that are inside it. the pieces of paper,

7    and you create a file for number one, and number two, and

8    number three, and all the way up until you got to whatever

9    that full number is.

10   Q    Okay.  And based on your experiences in the Internal

11   Affairs policy -- implementing policy, making policy, and your

12   experience with Internal Affairs generally as a police

13   officer, is it your opinion that 721 cases is particularly

14   burdensome, based on your experience?

15   A    I don't think so.  It's probably only -- no, I mean, I

16   don't see -- burdensome to make the copies?

17   Q    Right.

18   A    No, not particularly.

19   Q    Okay.  I don't think I have anything further for the

20   moment.

21              THE COURT:  Thank you, counsel.  Mr. Gelfand?

22                        CROSS-EXAMINATION

23   BY MR. GELFAND:

24   Q    Copying the individual files for a second, just because

25   that's where we left off.  It's not necessarily just a matter

Shane - Cross (Gel)                               74

1   of running paper through a copying machine, correct?

2   A    You need to expand on that.  Not necessarily.

3   Q    Under the Attorney General guidelines, if we're doing

4   Internal Affairs cases the right way, there's a lot of other

5   things that are potentially supposed to be in an Internal

6   Affairs file other than just paper, correct?

7   A    Well I don't think I follow you.

8   Q    You have familiarity with the Attorney General guidelines

9   for Internal Affairs investigations, correct?

10  A    Yes.

11  Q    And do you know whether there's anything that makes those

12  Attorney General guidelines actually mandatory for individual

13  municipalities to have the same or similar policy for their

14  Internal Affairs?

15        Are you familiar with the Statute that says every

16  municipality in New Jersey has to have an Internal Affairs

17  policy consistent with that of the Attorney General?

18  A    Yes.  There is a statute on that.

19  Q    Okay.  And the Attorney General guidelines say certain

20  things that are supposed to be collected in the Internal

21  Affairs file --

22  A    Yes.

23  Q    -- for every investigation that's done, correct?

24  A    Yes.

25  Q    That would include if a particular case may or may not

1    have relevant dispatch communications, correct?

2    A    Correct,

3    Q    May or may not have relevant photographs?

4    A    That's correct.  Forensic evidence.

5    Q    Possibly physical evidence, right?

6    A    Yeah, sure.

7    Q    There's a lot of things other than individual pieces of

8    paper that may need to be duplicated to give the entire

9    investigative content in any given file, correct?

10   A    Well the answer is maybe.  We're not looking for forensic

11   evidence, we're looking for the things that are required to be

12   in the file.  There would be a lab report in the file.

13   Q    Well, for example, though, how could you know if we did a

14   good job or swept something under the rug, if you haven't

15   reviewed the relevant radio communications in a given

16   investigation?

17   A    But those would be there, if they exist.

18   Q    Right.  But they might be on a compact disk that you're

19   not going to run through a copy machine, a compact disk would

20   have to be duplicated, correct?

21   A    Well then someone would transcribe them, or it would be

22   transcribed.

23   Q    Well the Attorney General guidelines don't require that

24   those things be transcribed, right?

25   A    No.  No.

1    Q    And do you know particularly whether every department

2    under the Attorney General guidelines is required to even have

3    a transcriber assigned?

4    A    No.

5    Q    And do you know --

6    A    That's not required, I should say.

7    Q    And do you know whether Atlantic City actually has a

8    transcriber that transcribes things in Internal Affairs cases

9    whenever they're necessary?

10    A    No, I do not.

11    Q    It's fair to anticipate that within the Internal Affairs

12    files we're talking about, there are potentially a lot of

13    things relevant to determining whether a fair investigation

14    was done that aren't simply pieces of paper that need to be

15    run through a photocopier?

16    A    Yes, that's possible.

17    Q    You've told us that this number seven that appears in

18    your report, and let me use your terminology so that I can try

19    to understand what this number represents.  This number of

20    seven predictors that you identified at page four of -- this

21    is what you're calling your second report, correct?

22    A    Yes.  Okay.  Um-hum.

23    Q    This number of predictors, you can't tell us what the

24    seven are, correct?

25    A    That's correct.

1    Q    If Judge Schneider agrees with you, we get 721 files,

2    after you get them and do whatever's going to be done with

3    them, would you then be able to tell us what the seven are?

4    A    Well after Ms. Bonjean and I discussed what we were going

5    to actually study, yes.

6    Q    Okay.  Is there a universe of potential predictors of

7    which this seven is going to be a subset?

8    A    Yes.

9    Q    Okay.  What's that universe?

10   A    That's the 44 that you were referencing earlier.

11   Q    Okay.  I didn't pick that 44 number out of thin air, by

12   the way, you know there's some number that's 44, correct?

13   A    I must admit, I did not count them, so I'm relying on

14   you.  So but that's what you're referring to, yes.  It's the

15   44, or that universe that we talked about, that population.

16   Q    Okay.  Do you have your other report in front of you?

17   A    Yes.

18   Q    Okay.  And in your other report what I'm talking about is

19   44 and you're taking my word for it that there's 44 of them --

20   A    Yes.

21   Q    -- these are included in pages two through seven of your

22   report, correct?

23   A    Let's just see.  Yes.

24   Q    Okay.  And I might have counted wrong.  I counted about

25   44.  Is it correct that as we increased or decreased that

1    number of variables at pages two through seven, if we made 44

2    -- instead of 44, if we had 100, that would increase the 721

3    number that you're telling Judge Schneider, correct?

4    A    No.  No.  No.

5    Q    Okay.  That number would stay the same regardless of

6    whether we increased or decreased those 44?

7    A    It would change if you -- if we're talking about the

8    number of predictor variables that were included in the model.

9    That's what would change it.  So the seven that appears in

10   Table 2 of the methodology report --

11   Q    Right.

12   A    -- if we change that number up or down from this 44 that

13   we pick from, so let's say we pick ten from the 44, or we pick

14   three from the 44, that 721 would go up or down from there.

15   Not from the 44 itself.

16   Q    Okay.  So changing the 44 isn't going to effect the

17   seven?

18   A    That's correct.

19   Q    And it isn't going to effect a bottom line?

20   A    That's only if we change the number of predictors that we

21   extract from the 44 and put into our model.

22   Q    Okay.

23   A    That would raise or lower that number 721.

24   Q    Okay.  Let me take a look at some of these 44.  The first

25   one you have listed -- strike that.  Let me just make sure

1    we're on the same page.  These 44 are broken down into

2    categories, correct?

3    A    Yeah, I did.  Yes.

4    Q    And the 44, that's not some authoritative list somewhere,

5    you compiled these 44 by going through the Attorney General

6    guidelines and picking out certain factors, listed them, and

7    you came up with 44, correct?

8    A    Not entirely.  They're consistent with the Attorney

9    General's guidelines, that's yes.  So that is the

10   authoritative source.  Number two, they're also consistent

11   with what you would find in any social science research study

12   on this matter.

13          And, number three, I cited, if you'd just give me

14   one second, I cited previous studies in this realm where these

15   types of variables appear.  So it's not -- it's nothing I

16   created or arbitrarily picked out.  They're consistent with

17   the Attorney General's guidelines, social science practices,

18   and the previous studies that are listed on page nine of that

19   document that reflect those types of variables.  That are

20   footnoted numbers three through eight.

21   Q    None of which are studies of a municipal police

22   department's Internal Affairs process correct?  New Jersey

23   Municipal Police Department's Internal Affairs process.

24   A    I don't know if they are from New Jersey specifically,

25   but a lot of these previous studies are of Internal Affairs

1   processes and practices, probably in the United States.  But a

2   lot of them are de-identified as a matter of confidentiality

3   so --

4   Q    Okay.

5   A    -- I don't know where they necessarily come from.

6   Q    Fair enough.  Let me go back a second.  Every one of your

7   44 somewhere within the New Jersey Attorney General

8   guidelines, you could point to and say, this is where the New

9   Jersey AG guidelines suggest Internal Affairs files should

10  have this information listed in them?

11  A    I think that's correct.

12  Q    Okay.  But the social science things on page nine, those

13  aren't specific to the New Jersey Attorney General guidelines

14  and the New Jersey Internal Affairs process?

15  A    Not that I know of, because I don't know where these

16  studies came from, because we can't identify them.

17  Q    We can't make that assumption?

18  A    We should not assume that they're from New Jersey, but

19  what we should do is assume that the variables that do appear

20  here are consistent with accepted social science practices.

21  Q    Accepted social science practices which are not

22  necessarily specific to police operations.  And, in fact, not

23  even specific to Internal Affairs either?

24  A    No, they are specific to police Internal Affairs.  That's

25  what these studies reflect.

1    Q    Okay.  When we look at the New Jersey Attorney General

2    guidelines, the 44 individual items that you've included at

3    pages two through seven, am I correct that there's no place

4    where those 44 items are separately listed within the

5    guidelines, but rather you pulled them out of the guidelines?

6    A    There, or the previous studies that have been done on

7    Internal Affairs, and the variables that I would use as a

8    social scientist if I were conducting a study on Internal

9    Affairs.

10   Q    Can you tell us which of the 44 you got from where?  If

11   we went through them one at a time?  First, would you be able

12   to do that?  I'm not sure I'm going to ask you to do it.  But

13   if we asked you to go through the 44, would you tell us

14   whether they come from the New Jersey Attorney General

15   guidelines, whether it comes from some other social science

16   thing that's referenced at page nine, or some -- I forget what

17   the third category is, some other source?

18   A    I have not listed them in that way.  Except to say that

19   they're all consistent with those three things.

20   Q    With at least one of those three things, not necessarily

21   all three, though, right?

22   A    Right.  So -- yeah, exactly.  So maybe some demographic

23   characteristics were pulled from -- from these studies, and

24   things that were germane to New Jersey were pulled from the

25   Attorney General's guidelines.  But I think it's safe to say

1   that these 44 variables do exist in the New Jersey Attorney

2   General's guidelines.

3   Q    Right.  What I'm trying to determine is, are these 44

4   variables predictors of what we're trying to prove in this

5   case, based upon what the allegations are.  In other words,

6   let's start --

7   A    I think the answer's, yes, they are.

8   Q    Okay.  Let's start with the first variable --

9   A    Okay.

10  Q    -- the complaint number.  If we have a given Internal

11  Affairs file, why do we need to know the complaint number, or

12  whether the complaint number is recorded in the file in order

13  to determine whether this file is evidence of a custom of

14  sweeping Internal Affairs cases under the rug?

15  A    Well it's not.  It's identified for tracking purposes.

16  Q    Okay.

17  A    So you make sure there's no duplication of anything.  If

18  you've got a unique number, you can go back and say, I already

19  have number one, we didn't duplicate that somewhere.

20  Q    So while it's a variable listed in your second report,

21  it's not a variable that we need to look at to make the -- to

22  test the hypothesis that we're testing in this case?

23  A    That's right.  Yes.

24  Q    Okay.

25  A    But I think it would be included in the master log.

Shane - Cross (Gel)                                          83

1    Q    Right.

2    A    And if you're going to photocopy the master log, it would

3    come up.

4    Q    Okay.  And let's say we give you the master log.

5    A    Okay.

6    Q    Actually, a number of your variables, we don't need

7    discovery of any Internal Affairs files at all, if we have the

8    master log, correct?  That would cover a number of these 44

9    variables?

10   A    I don't think I understand your question.

11   Q    Okay.  You don't need -- am I correct that, if I handed

12   you the -- what you would expect to see as the Internal

13   Affairs log, and let's assume it looks something like what you

14   would expect to see, you don't need any Internal Affairs files

15   to make a determination as to whether we keep a log of

16   complaint numbers.  You can look at the log, you don't need

17   individual files to see that.

18   A    No, the individual -- if you've got all these items

19   captured here in your master list, then we wouldn't need that.

20   But we do need it, because there are things that are in here,

21   that are not captured in there.

22   Q    Okay.  But there's 13 things captured in the master log.

23   A    Okay.

24   Q    I'll ask you to make that assumption.

25   A    Okay.

1    Q    I'm looking at it and there's 13 columns, and actually --

2    A    Okay.

3    Q    -- the form changed over the years at some point.

4    A    Okay.

5    Q    -- two different forms.  But at least some of the

6    variables, like complaint number.  If the complaint number is

7    listed in the Internal Affairs log, we wouldn't need discovery

8    of any individual files to make a determination as to whether

9    or not we're properly handling that variable.

10    A    No, I don't think so.  If I understand you correctly.

11    There's no -- you're saying is there a relationship between

12    our case and the complaint number?

13    Q    I'm saying if the complaint numbers are listed in the

14    Internal Affairs log and we can in discovery hand out the

15    Internal Affairs log, why do we need to consider the complaint

16    number as a variable in determining how many Internal Affairs

17    actual files have to be released in discovery?

18              MS. BONJEAN:  Objection.  It assumes a fact not --

19    it's not the testimony.

20              THE COURT:  Objection overruled.

21              THE WITNESS:  I guess maybe I'm not following you

22    correctly.  And I apologize.  But what we're saying here is

23    that the number of cases that we need is not dictated by

24    whether or not it contains a complaint number.

25              What I'm saying is that. if you have the complaint

1  number, and if it's turned over to us, we would be able to

2  identify uniquely that case number six, identified by the

3  complaint number in the Atlantic City Internal Affairs log

4  from 2003, is missing these things.  It's a unique tracking

5  number.

6  BY MR. GELFAND:

7  Q    A unique tracking number that can be determined from the

8  log without looking at the individual files?

9  A    Yeah, but I don't know what's in that file.  I only know

10 that there's a number there.

11 Q    Let's take zip code, that's one of the variables that you

12 have at page three of --

13 A    Okay.

14 Q    -- your first report, correct?

15 A    Okay.

16 Q    Why is zip code a variable that's included within your

17 report, when we don't have an allegation in this case that the

18 custom of Internal Affairs dispositions depends upon the zip

19 code where the allegation occurred?

20 A    Because we still may have a pattern or practice that can

21 be identified spatially.  To be able to say people complaining

22 from this particular area have all their cases not sustained.

23 People complaining from this zip code had all their cases

24 sustained.

25 Q    So you're looking for pattern.  You created the

1    statistical analysis in order to be able to disclose patterns,

2    regardless of whether or not those patterns are what are

3    alleged in this case, has the custom that was the driving

4    force of the constitutional violation, correct?

5    A    I'm not clear on that.  I want to make sure I answer

6    clearly because --

7    Q    The example we just had, zip codes.  That's in order to

8    -- because including consideration of zip codes would allow us

9    to determine if there's a pattern of sustained rates based

10   upon where the incident happened, correct?

11   A    Yes.

12   Q    But we don't have an allegation in this specific case

13   that the custom of Atlantic City is to sustain or not sustain

14   cases disproportionately based upon where they occurred.  So

15   you're examining, aren't you proposing to examine for testing

16   variables which are not alleged to be the custom that's at

17   issue in the case.

18   A    It's my understanding that the patterns of Internal

19   Affairs practices are being examined.  Am I --

20   Q    That's not mine.  But, I mean, maybe it's the Judge's or

21   somebody else's -- or the plaintiffs or somebody else's in

22   this room.  My understanding is what we're actually trying to

23   get discovery on is what was pleaded in the case, which is not

24   that this location versus this location.  Or that we sustain

25   cases brought by white people more than black people.

Shane - Cross (Gel)                                    87

1          All those things are possible allegations.  But the

2     one that's been made in this case is that, across the board,

3     we tried to sweep allegations under the rug, rather than

4     sustaining them.

5          You came up with your 721 sample in order to test

6     for a variety of things other than that, correct?

7     A    I want to test for that -- well that's a statistical

8     test.  But I would also like to test the process.  I would

9     like to map the way that the Internal Affairs investigation

10    occurred against a standard.

11    Q    In order to see if there's anything that's out of whack,

12    not just to see whether we're sweeping allegations under the

13    rug across the board, right?

14    A    Two diff -- yeah, they're two different questions.

15    Q    It sounds to me, tell me if I'm wrong, I don't want to

16    put words in your mouth, but it sounds to me like the number

17    of files that you came up with is based upon what we would

18    look for if we wanted to generally analyze the Internal

19    Affairs process to see if we're doing it according to Hoyle,

20    correct?

21    A    Who's Hoyle?

22    Q    To see if we're doing it according to the New Jersey

23    Attorney General guidelines, for example.  To see if we're

24    disproportionately sustaining cases based upon the gender of

25    the complainant.  To see if we're disproportionately

1    sustaining cases based upon the officer's assignment, whether

2    it's a special assignment, or is it an ordinary patrol

3    officer.

4           But none of those things are the custom that's

5    alleged in this case.

6    A    That's my understanding.

7           MS. BONJEAN:  Is this a question?  Objection, Judge.

8           THE COURT:  Objection overruled.

9           THE WITNESS:  It's my understanding that we are

10   trying to generalize that the Internal Affairs process does

11   not follow the Attorney General's guidelines, and that we

12   could point to a variety of different cases, different types

13   of cases, so, excessive force, internal complaints versus

14   external complaints, those kinds of things, we can generalize

15   and say, not only does it not follow the Attorney General's

16   guidelines, but you can see here in a variety of different

17   cases the result is similar.

18   BY MR. GELFAND:

19   Q    Your 721 would allow for a fair statistical sample to

20   include, for example, I think Ms. Bonjean asked you whether

21   officers in special assignments have Internal Affairs cases

22   sustained at a lower rate as compared to regular patrol

23   officers, correct?

24   A    That's correct.  Yes.

25   Q    Regardless of whether that's the allegation that's been

1  made in this case, that's something you're looking to test by

2  looking at 721 files?

3  A    That's correct.

4  Q    Is there a recognized -- let me first ask you if there's

5  some form of scientifically -- and by scientific, I mean

6  including pulling science and Internal Affairs science, as if

7  it were a science, is there a recognized factor, everything

8  else being equal, what we should expect to see as a sustain

9  rate for Internal Affairs cases if they're being done

10 properly?

11          MS. BONJEAN:  Objection.  This is outside the scope.

12 This is not -- has nothing to do with sampling, Judge.

13          THE COURT:  Okay.  Why is this relevant?

14          MR. GELFAND:  Because he did say that he's talking

15 about comparing our files to some form of recognized

16 standards.  And I heard the implication that we can determine

17 -- for example, if we find that Atlantic City is sustaining

18 three percent of their cases, there's a nat -- is there a New

19 Jersey or a national standard that says if we're doing it

20 right, we'd be sustaining probably more --

21          THE COURT:  Objection overruled.  But I don't think

22 -- I hope we're not going very far down this road, because I

23 don't think this is the crux of what we're here for.  But

24 objection overruled.

25          THE WITNESS:  So the answer to that question is, I

1    was comparing to whether or not those things should be

2    included or should be part of the investigation, not that we

3    would attach a specific number to it.  So, for example, if the

4    Attorney General's guideline called for witness statements to

5    be included as part of the Internal Affairs investigation, and

6    I looked at, you know, this random sample that we got and they

7    did not have them, I'd be able to go back to the standard and

8    say, the AG guideline said that this should be present, but in

9    one percent of the cases, instead of 100 percent of the cases,

10   it's present.

11   BY MR. GELFAND:

12   Q    Is there somewhere within the proposed statistical study

13   that you've put in your report that accounts for determining

14   on a yes/no basis, does this individual file that we're

15   looking at appear to be a complete, thorough and objective

16   investigation?

17   A    Well the Attorney General's guideline would point to

18   that.

19   Q    Right.  But is that something that you're going to tell

20   me that that's a factor that you're looking at somewhere in

21   the 44, or somewhere within the seven?

22   A    I think we're mixing two different things.  I think we're

23   mixing the statistical analysis with the process evaluation.

24   Q    And what I want to know is, from all of that, where is it

25   that you -- where -- is it somewhere in your report that one

1    of the factors you propose to evaluate is, does this

2    particular file look like a fair, thorough and objective

3    analysis of the allegations, and whether they really happened?

4    A    Well these 44 variables would reflect that.  These 44

5    things that were pulled from right here --

6    Q    Well not race, for example.  We've already said race, you

7    know, race of the complainant isn't going to tell us whether

8    the actual allegation really occurred as alleged and whether

9    it was fairly and thoroughly investigated.  It's just going to

10   tell us whether we have a white or a black or some other race

11   complainant.

12   A    That's right.  That's something a little -- that's the

13   ability to generalize, to be able to say maybe, you know,

14   white or non-white offenders against white or non-white

15   officers have some sort of pattern that emerges.  And in those

16   patterns, cases are not sustained at a greater rate for one or

17   the other.

18   Q    Isn't it also true that of those 44 factors we're talking

19   about, any combination -- I'm sorry, of those 44 variables you

20   list at pages two through seven, any combination of those

21   factors might not be in a given Internal Affairs file, but the

22   absence of those factors still wouldn't prevent a conclusion

23   that the allegation against the officer is sustained, and

24   wouldn't prevent the officer from being disciplined based on

25   that case, because a particular variable was absent, because

1   even if all the variables were absent, if somehow the case was

2   still investigated, the case could still be sustained without

3   some of those variables.

4               Without a recording of the complaint number and the

5   actual report --

6   A     Yeah.

7   Q     -- if we interviewed the complainant and actually --

8   A     Yeah.

9   Q     -- took the information and investigated it without

10  recording every word -- we could do all that --

11  A     That's true.

12  Q     -- not have it in the report, so we'd get nos on your 44

13  factors, we could still sustain the allegation, and there's

14  nothing in the law that tells us we wouldn't be able to

15  discipline our police officer because we didn't meet each one

16  of the 44 factors in pages two through seven.

17  A     All right.  I understand what you're saying.  I think

18  what we're trying to capture here is the overall picture of

19  how Internal Affairs investigations play themselves out.

20              I don't think we're splitting hairs necessarily on

21  the complaint number.  But when you get down to the substance

22  of things like date, time, day of week, location, zip code,

23  age, race, sex, type of allegation, assignment, those are

24  things that affect whether or not the investigation is going

25  to play itself out thoroughly.  Who the chief is at the time,

1    who the supervisor is, because patterns often emerge under

2    different supervisors.  Take a supervisor out put a new

3    supervisor in, pattern disappears.

4          New chief comes in, new model, new leadership, the

5    pattern changes.

6    Q    Have you been given any basis to believe that there's an

7    allegation in this case that in the quality of the Internal

8    Affairs investigations has varied from chief-to-chief?

9    A    Well I think when Ms. Bonjean and I discussed the case,

10   she said she made some reference to cases that she had looked

11   at where the cases where incomplete and that -- I don't know

12   if it spanned from chief-to-chief, but it is possible that it

13   did.

14   Q    Were you given the idea that that's an allegation that

15   we're trying to prove by disclosure of individual Internal

16   Affairs files in discovery and having the opportunity to look

17   at them?

18   A    No, I don't think so.

19   Q    The article on the maritime issue that we've been given a

20   copy of --

21   A    Yes.

22   Q    -- was there a hypothesis that that article addresses in

23   some form proving, disproving, is there something you could

24   fairly describe in that fashion?

25   A    Yes, there is.

1   Q    And what's the hypothesis?

2   A    May I refer?

3   Q    Well do you know generally?  I'm not going to hold you to

4   the details of it.

5   A    Yeah, generally, off the top of my head, one of the

6   hypotheses is that the presence of situational crime

7   prevention factors will increase the likelihood of an

8   unsuccessful pirate attack.

9   Q    Okay.  Sitting here right now, are you able to give us an

10  idea of what you understand to be the hypothesis that we're

11  either trying to prove or disprove by this exercise of

12  examining Internal Affairs files?

13  A    That cases are sustained or not sustained at different

14  rates for different assignments controlling for other factors,

15  that there are -- that the process itself is flawed based on

16  the standard as enunciated by the Attorney General's

17  guidelines.

18  Q    And, I'm sorry, I don't mean to harp on this point, but

19  the list of 44 at pages two through seven, is it fair to say

20  that if another well-qualified statistician with police

21  practice in Internal Affairs experience went through the

22  Attorney General guidelines and the other sources you

23  mentioned they may -- a different statistician may have come

24  up with a different 44?

25  A    Unlikely.

1    Q    Well, for example, do you have anything about an early

2    warning system within your 44 variables?

3    A    I don't think so.

4    Q    Okay.  There is an early warning system requirement in

5    the Attorney General guidelines, correct?

6    A    Correct.

7    Q    A different statistician and Internal Affairs persons

8    might have thought a relevant variable to consider is whether

9    the cases are examined to see if they trigger an early warning

10   systems criteria, and whether the early warning system was

11   followed if it does trigger the criteria?

12   A    Yeah, that's correct.

13   Q    So there's other things different people might have

14   culled from the Attorney General guideline to include within

15   those variables?

16   A    Yeah.  I'm not thinking about, you know, just one or two,

17   I'm thinking about -- when you phrase it that way, I was

18   thinking that, well, they're going to come up with something

19   completely different, not one or two, here or there.

20        But, yes, one or two, here or there, I could see

21   that.

22   Q    Very briefly, regarding your training and experience.  Do

23   you have the same understanding that I do, that there is a

24   sort of recognized standard Attorney General education program

25   for certifying people in the Internal Affairs process in New

Shane - Cross (Gel)                                    96

1    Jersey?

2    A     Yes.  Run by the DCJ.

3    Q     Did you have that training?

4    A     I did not.

5          (Pause)

6          MR. GELFAND:  I'm sorry, Judge.  Could I take ten

7    minutes?  I have a separate list of questions.  Some of them

8    I've covered already and it might go quicker if I can --

9          THE COURT:  Okay.  But before we take a break, in

10   light of the time schedule, what is your suggestion we should

11   do with your expert and his schedule?  Does it look like we'll

12   have to have him come back another day, Mr. Gelfand?  I don't

13   have an objection to that.

14         MR. GELFAND:  I'm sorry to say, I think that's what

15   it looks like.  I don't want to cut it short.

16         THE COURT:  Okay.

17         MR. GELFAND:  Or anything like that.  And even if I

18   took ten minutes and we got done with this gentleman in ten

19   minutes --

20         THE COURT:  I understand.

21         MR. GELFAND:  Yeah.  I think --

22         THE COURT:  I think in fairness, you know, we told

23   the gentleman we would let -- he would be permitted to leave

24   by four.  I don't -- I think we can all agree it's not

25   practical to finish Dr. Shane and your expert, so we'll just

1    have to finish this hearing of your witness testifying on

2    another day.

3            So why don't we take a ten-minute break.  Sir, sorry

4    we didn't get to you today, but -- but you're welcome to stay

5    around, but we'll excuse you.  So you don't have to testify

6    today, and your counsel will let you know when we're going to

7    reconvene, but I don't see any reason why we can't finish

8    everything else today.  I'd like to do that.  Finish

9    everything today, except for testimony from your consultant.

10           So let's take a ten-minute break, and then we'll

11   come back.

12           MR. GELFAND:  Thank you, Your Honor.

13           THE CLERK:  All rise.

14      (Court in recess 3:24 p.m. to 3:38 p.m.)

15           THE COURT:  Please be seated.  Dr. Shane?  Mr.

16   Gelfand?

17           MR. GELFAND:  Thank you, Your Honor.

18   BY MR. GELFAND:

19   Q    Dr. Shane, I have really one more point I want to go back

20   and focus on for a second.

21   A    Okay.

22   Q    The number of predictors you have listed in Table 2 on

23   page four of your second report, I believe it was.

24   A    Yes.

25   Q    That's seven, correct?

1    A    That's seven, did you say?

2    Q    Seven.

3    A    Yes, it is.

4    Q    Okay.  You can't tell us sitting here right now what

5    those seven predictors are, correct?

6    A    That's correct.

7    Q    Okay.

8              THE COURT:  Will they be of the 44?

9              THE WITNESS:  That's correct.  Yes, they will.

10   BY MR. GELFAND:

11   Q    And when is it that you would be able to tell us what

12   those seven are?

13   A    Well after I confer with Ms. Bonjean and we -- I

14   establish our hypotheses and the questions that we're going to

15   answer.

16   Q    So the report you authored to determine our discovery

17   issue today as to how many Internal Affairs files we have to

18   release, is without yet having gotten a determination as to

19   the hypotheses that the discovery is trying to test?

20   A    No, we know how many cases we would like to have.

21   Q    No, no.  You just told me you'll -- after you get the 721

22   cases, you would discuss those with Ms. Bonjean, then come up

23   with the seven predictors based upon the hypothesis of the

24   case that you can find from the 721, right?

25   A    That's correct.

Shane - Cross (Ril)                                    99

1    Q    So in asking for the 721 files, you haven't yet

2    determined the hypothesis that's actually going to be tested

3    from looking at those 721 files?

4    A    That's correct.

5    Q    Okay.

6              MR. GELFAND:  I don't have anything further, thank

7    you.

8              THE WITNESS:  Thank you.

9              MR. RILEY:  Judge, may I have -- cross-examine?

10             THE COURT:  Oh, excuse me.  Yes.

11                          CROSS-EXAMINATION

12   BY MR. RILEY:

13   Q    Good afternoon, sir.

14   A    Hello.  How are you?

15   Q    Pretty well.  A couple of quick questions.  You keep

16   going back to this number seven.  Let me ask you this, have

17   you ever read the complaint in this case?

18   A    I have.

19   Q    You have?  And in that group of 44, do you have facts or

20   concerns that are reflected in the 44 that are in the

21   complaint, specific to the complaint?

22   A    I'm sure there are.  I don't know off the top of my head.

23   Q    But you're telling us today that in that seven, that

24   group of seven, as I understand it, the number seven drives

25   the number of -- the sample size, correct?

1    A    Yes, that's correct.

2    Q    So in other words, if you're looking for nine variables,

3    it would be a bigger sample size?

4    A    Correct.

5    Q    Less than seven, it would be a smaller sample size?

6    A    Correct.

7    Q    But you can't tell us what those are?

8    A    Correct.

9    Q    Even today, knowing full well what's in the complaint,

10   you can't tell us specifically what fact-specific variables

11   would be in that seven?

12   A    Not at this moment, no.

13   Q    No.  And what would happen is, you want to get the 721,

14   and then you and Ms. Bonjean are going to sit around and

15   determine what her theory of the case is, and that's what's

16   going to be contained in that seven, right?

17   A    Not exactly.

18   Q    Well now that's not what you said.  You said earlier

19   you're going to meet with her, and that conversation, that

20   meeting is going to determine what those seven variables are.

21   That's what you told us earlier.

22   A    Yes, but that doesn't drive the sample size per se.

23   Q    I'm not concerned about the sample size.  I'm talking

24   about the objectivity and fairness of this overall study.  You

25   mentioned to counsel that the issue of the early warning

1    system wasn't even in the 44 variables, right?

2    A    Correct.

3    Q    And you would agree with me that the early warning system

4    is a pivotal part of the Attorney General's guidelines as it

5    relates to Internal Affairs.  You would agree with me,

6    wouldn't you?

7    A    I would agree with that, yes.

8    Q    Yes.  And there's a number of other things that are so

9    fundamental to effective examination by the Internal Affairs

10   office, and you're not going to include those in there either,

11   are you?

12   A    For example?

13   Q    Well the issue in the early warning system, isn't that

14   significant?

15   A    To determining whether or not a pattern exists?

16   Q    To determine whether or not this -- depending if you're

17   going to keep it to facts specific to this case, and just

18   going to do a general report, a sociological study of the

19   Internal Affairs office.

20   A    No, we want to make sure the Attorney General's

21   guidelines, as a matter of process, are followed.

22   Q    Okay.  And you would agree with me one of the most

23   important pieces of that Attorney General's guideline is the

24   early warning system?  That's correct, isn't it?

25   A    I would not say that it's one of the most important

1   pieces.  I would say that it's a factor to consider.

2   Q    Well isn't that the system that determines whether or not

3   a particular officer is making repeat violations within the

4   course of a year?

5   A    Yes.  Usually.

6   Q    Usually?  And isn't that one of the most important

7   functions of Internal Affairs is determining whether or not

8   they have an officer that has particular problems?

9   A    One of, yes.

10  Q    Well isn't that what this is all about as to whether or

11  not, you know, Officer Wheaten is such a repeat offender that

12  he should have been disciplined, fired, retrained, isn't that

13  one of the allegations in this case?

14  A    Yes, but there are other variables that will tell us that

15  besides the early warning indicator.  The number of complaints

16  generated will, in it's aggregate form, will tell us that.

17  Q    Well the number of complaints generated is the

18  fundamental piece of the early warning system, isn't it?

19  A    Yes.

20  Q    Isn't that what the early warning system is set up to

21  measure?

22  A    Yes.

23  Q    Frequency of complaints?

24  A    Yes.  But I don't need that early warning system to know

25  that.  I mean, if I have -- if I have complaints that come in

1    from Wheaten and his name is listed there, I'll know that they

2    came from him.

3    Q    Sir, it's a pretty simple question.  The existence or

4    non-existence of an early warning system in an Internal

5    Affairs Office, okay, is significant because that would be --

6    if they didn't have it, it would certainly violate the

7    Attorney General's guidelines, wouldn't it?

8    A    But it would not be -- it would not render -- it would

9    not render the patterns and practices that were developed from

10   the data that we collected invalid.  Whether we looked at

11   that.

12   Q    Well what about the possibility the requirement that in

13   an Internal Affairs investigation done by a local police

14   department has to be reviewed by the county prosecutor?

15   You're familiar with that, aren't you?

16   A    Yeah.  Sure.

17   Q    Okay.  Is that one of your variables?

18   A    No.

19   Q    Thank you, sir.  I have no further questions.

20                    REDIRECT EXAMINATION

21   BY MS. BONJEAN:

22   Q    Dr. Shane, theoretically how many variables can we have

23   to look at, if we culled from national norms, state norms,

24   county norms -- the number could be greater than 44, correct?

25   A    It's most likely to be greater than 44.

1    Q    In fact, you identified 44.

2    A    Yes, correct.

3    Q    We can add the forty-fifth, the early warning system,

4    right?

5    A    We could add that.

6    Q    In fact, why don't we do that.  Why don't we add the

7    warning system as our forty-fifth factor.  Does that sound

8    like a good idea to you?

9    A    We could do that.

10   Q    I'd like you to do that.  Now my question is, whether

11   there are 44 factors, 45 factors, whatever those factors are,

12   that doesn't change your analysis about what the sample size

13   should be, correct?

14   A    That's correct.

15   Q    Okay.  Now I want to get back to -- I want to just

16   clarify a couple of things.  One thing that we are looking at,

17   or what I've asked you to look at, is a process evaluation,

18   correct?

19   A    Yes.  That's correct.

20   Q    And that is an evaluation of the process to see whether

21   it is in the -- Atlantic City's Internal Affairs process is in

22   accordance with state norms and national norms, right?

23   A    That's correct.

24   Q    Not just -- the rules shouldn't be different in New

25   Jersey rather than any other state, right?

1    A     That's correct.

2    Q     They should be -- it should be national ones that are

3    followed, right?

4    A     That's correct.  Yes.

5    Q     So the Attorney General guidelines is one authority,

6    correct?

7    A     That's correct.

8    Q     There are also national norms that we might look at?

9    A     Yes, there are.

10   Q     And those are so-called CALEA standards, correct?

11   A     Yes.

12   Q     Okay.  So that's one thing.  The process evaluation.

13   Okay.  In addition to the process evaluation, we may want to

14   do some statistical analysis as well, correct?

15   A     Correct.

16   Q     Now isn't it fair to say that we could study, based on

17   these Internal Affairs, any possible theory out there, there

18   being hundreds of theories we could test out, right?

19   A     Sure.

20   Q     I'm not asking you to test out hundreds of theories,

21   correct?

22   A     Correct.

23   Q     In fact, we've identified -- isn't it fair to say we

24   talked about a hypotheses -- about three or four hypotheses?

25   A     Sure.  As in type of assignment, those sorts to things.

Shane - Redirect                                           106

1    Q    Well let me go through it.  Did we discuss one hypotheses

2    that we are considering, and is a correlation between

3    disposition, number of complaints and assignment?

4    A    Yes.

5    Q    Correct?  Okay.  Do we know exactly how to formulate that

6    yet?

7    A    No.

8    Q    Okay.  In that example, if we're going to control for

9    certain things, how many variables do you think we want to

10   look at from that 44, or 45, or 55, whatever it is?

11   A    Seven to ten.

12   Q    Okay.  And that's why you said seven, right?

13   A    Correct.

14   Q    In fact seven is sort of a modest number?

15   A    It's a very reasonable number.

16   Q    Okay.

17             THE COURT:  Is that a predictor, is that what you

18   called the predictor in Table --

19             THE WITNESS:  Yes, Judge.

20   BY MS. BONJEAN:

21   Q    These are synonyms, correct?

22   A    Yes.  Predictors, independent variables.

23   Q    Independent variable -- independent variable and

24   predictor is a synonym?

25   A    Yes.

1    Q    Okay.  One other thing that we discussed is to look at

2    the rate of sustaining complaints when a complaint is from a

3    civilian versus internally, correct?

4    A    Internal versus external complaints.

5    Q    Okay.  That's one theory that we talked about, right?

6    A    Correct.

7    Q    It's one hypothesis.

8    A    That's correct.

9    Q    Isn't it fair that I told you my hypothesis is that when

10   someone internally in the Police Department complains about a

11   police officer, whether it be some type of infraction,

12   administrative infraction, that the rate of sustaining is much

13   higher than when a civilian?

14   A    Correct.

15   Q    That's my theory, based on a number of things that I've

16   actually identified in my complaint, right?

17   A    Yes, we discussed that.

18   Q    And that's one thing that I want you to test for,

19   correct?

20   A    Correct.

21   Q    That's one theory that we talked about?

22   A    Yes.

23   Q    Did we layout the hypothesis in exact words and know

24   exactly what factors we're going to look at to make that

25   determination?

Shane - Redirect                                            108

1    A    No, we did not.

2    Q    Is it fair to say we're going to probably look at the

3    outcomes?  That's one factor?

4    A    That's correct.

5    Q    That's one variable we'll look at, right?

6    A    Correct.

7    Q    I mean, if we're going to do the work in the courtroom

8    here, I mean, I didn't realize that was what this hearing was

9    for, but we'll do it.  One is an outcome, right?

10   A    That's right.

11   Q    And then one is perhaps the type of complaint?

12   A    Type of complaint.

13   Q    Who made the complaint?

14   A    Age, sex, race, those sorts of things of the complainant.

15   Q    And we're not --

16   A    And the officer.

17   Q    And we're not necessarily testing because we want to know

18   whether there's a racial component here, right?  What -- are

19   we looking at race to control for race?

20   A    Sure.  Because perhaps, I don't know, let's say if the

21   offender is black, complaints are sustained at a higher or

22   lower rate, compared to the officer's race.  Or gender, for

23   example.  Maybe female complaints have their cases sustained

24   at a higher or lower rate when the officer is male.

25             Or whatever the case may be.

1    Q    I've never told you that this had a racial component,

2    correct?  In this case.

3    A    No.

4    Q    In fact, you've met the plaintiff in this case, right.

5    A    That's correct.

6    Q    And she's a woman, right?

7    A    She is.

8    Q    And she's a white woman, right?

9    A    Correct.

10   Q    So I'm not asking you, nor have I asked you to actually

11   do some analysis about racial profiling with the Atlantic City

12   Police Department, have I?

13   A    No.  No, it's not intended for that.

14   Q    Okay.  The factors and variables that you laid out in the

15   data elements is a somewhat exhaustive list of what you would

16   expect to see in an Internal Affairs complaint, right?

17   A    That's correct.

18   Q    Okay.  And, again, that number 44 hasn't driven this 721

19   number, right?

20   A    A 44?

21   Q    I'm sorry, the 44 data elements isn't what has driven the

22   sample size?

23   A    No, it is not.

24   Q    We're saying that, depending on our hypothesis, and we've

25   discussed some ideas of what our hypothesis will be, we can

1  fairly well assume that at least we're going to want to have

2  seven variables to test that hypothesis, right?

3  A     That's correct.  Yeah.

4  Q     Okay.  To control for some, and to look at -- look at

5  what we're looking at, which --

6  A     That's right.

7  Q     Okay.  Have I also asked you that I want to look at

8  sustaining rates generally speaking for different types of

9  offenses?

10 A     Sure.

11 Q     Like excessive force?

12 A     Yes.

13 Q     Do you know whether excessive force is a factor in this

14 case?

15 A     In this particular case it is, yes.

16 Q     Right.  And what about false arrest, for instance,

17 correct?

18 A     Yes.

19 Q     Demeanor?

20 A     Yes.

21 Q     I want -- I've asked you that we want to look at rates of

22 exoneration versus sustained or not sustained with respect to

23 the complaint that has been made, right?

24 A     That's correct.  Yes.

25 Q     And even looking at that one little -- that one

1    hypothesis, how many factors do we likely need variables,

2    predictors, whatever word you want to -- how many do we likely

3    need to draw a fair and reasonable statistical conclusion

4    about that?

5    A    At least seven to ten.

6    Q    Okay.  So that's where you're getting this seven number,

7    right?

8    A    Correct.

9    Q    Okay.  Now it's true that some of the factors that you

10   list of the 44 that are factors that we would want to see an

11   Internal Affairs complaint, appear on a master log, right?

12   A    They do, yes.

13   Q    Okay.  They also -- we're not really disputing that,

14   correct?  I think Mr. Gelfand said there were 13 that appeared

15   on the master log.

16   A    Sure.

17   Q    Okay.  No debate there, right?

18   A    No.  No.

19   Q    Okay.  There's also at least 35 others that do not appear

20   on the master log, right?

21   A    Correct.

22   Q    All right.  Now Mr. Gelfand asked you about, it's not

23   just paper that has to be copied, right, from the Internal

24   Affairs files necessarily?

25   A    He said that, correct.

1    Q    Yes.  There could be dispatch tapes, right?

2    A    Sure.

3    Q    We don't necessarily have to transcribe the dispatch

4    tapes, do we?

5    A    No.  If he wants to hand them over in their form, that's

6    fine.

7    Q    They could make copies, right?

8    A    Sure.

9    Q    You can make a copy of a piece of paper, just like you

10   can of a DVD, right?

11   A    Sure.  Sure.

12   Q    And -- when we're talking specifically about process

13   evaluation, okay, you don't necessarily need to do a power

14   analysis, correct?

15   A    That's correct.

16   Q    The power analysis itself has to do with drawing

17   statistical conclusions, right?

18   A    That's correct.

19   Q    But do you still need a -- you still need a random sample

20   to do a process evaluation?

21   A    You should still have a stratified random sample, yes.

22   Q    Correct.

23   Q    And if you are working for the Atlantic City Police

24   Department and you want a fair conclusion being made about

25   your process, don't you want a hearty sample?

1    A    Sure.  Over a longer period of time.

2    Q    Isn't that in the best interest of the Police Department,

3    would you say?

4    A    Sure.  Internally, of course.

5    Q    You would want reliable conclusions, correct?

6    A    You can't make improvements if you don't have reliable

7    conclusions.

8    Q    And, obviously, the purpose of this litigation isn't

9    necessarily to force Atlantic City to make improvements.  But

10   it is one possible outcome, correct?

11   A    Sure.  Well you can't do anything though, you can't make

12   changes, you can't move personnel in or out, you have no basis

13   to make any decisions on.

14   Q    There is something called declarative or injunctive

15   relief that a Judge could theoretically order, you've heard of

16   those terms before?

17   A    Yes.  But you forgive me on my legalese.

18   Q    Well you've heard of a Judge ordering a Police Department

19   to do something different than what it's doing, correct?

20   A    Yes.

21   Q    That is one possible remedy or outcome that could happen

22   in a litigation, right?

23   A    Sure.  Sure.

24   Q    So we do care about policy, and even in the context of

25   this litigation, right?

1   A     Sure.  Sure.

2   Q     And presumably so does Atlantic City?

3   A     Yes, of course.

4   Q     Okay.  I mean, as a police officer, you care about

5   whether you might have a declarative or injunctive relief if

6   you are the chief of police, for instance, correct?

7               MR. RILEY:  I object.  The relevance of this is --

8               MS. BONJEAN:  This is -- I've made my point, Your

9   Honor.  I'll withdraw it.

10  BY MS. BONJEAN:

11  Q     So you read the complaint in this case, correct?

12  A     Yes.

13  Q     And are you also aware that assignment is an issue in

14  this case?

15  A     Yes.

16  Q     That the officer that was -- is being accused of

17  wrongdoing was on special employment detail?

18  A     Yes.

19  Q     Have we discussed the fact that it's my theory that there

20  is a greater incidence of excessive force cases in special

21  employment details than one would expect, given the level of

22  danger in that position, and also as compared to even more

23  dangerous types of assignments?

24  A     Yes.  We talked about that.

25  Q     Okay.  And that's one theory that we've discussed, one

1    potential hypothesis, right?

2    A    Yes.

3    Q    And if we were studying that, how many variables or --

4    A    Predictors.

5    Q    -- predictors would we want to look at for that

6    hypothesis?

7    A    Seven to ten.

8    Q    Right.  So that's where you got your seven number, right?

9    A    Sure.

10   Q    That's not an arbitrary number?

11   A    No.  It's based on social science convention, reasonable

12   social science convention.

13   Q    And I'm certainly not asking you, and nor intending to

14   compensate you to look at every possible scenario in the

15   context of this case of what's going wrong in the Internal

16   Affairs process, right?

17   A    That's correct.

18   Q    It's limited to the facts of this case.

19   A    Correct.

20   Q    We've talked about certain theories.

21   A    Correct.

22   Q    But until we figure out where we're -- until we get

23   further in the process, isn't it right that we can't really

24   fine-tune our hypothesis?

25   A    True.  And we also want to be able to say that, in

Shane - Redirect                                    116

1   addition to these things we've also looked at this data this

2   way, and the process is flawed in these areas as well.

3   Q    And, Dr. Shane --

4   A    Which is a broader implication.

5   Q    -- Dr. Shane, let me ask you this.  Are you happy to

6   reveal in a report at some point every factor that was ever

7   considered and every hypothesis we are looking at, and drill

8   down so that the other side has a fair opportunity to respond

9   to that?

10  A    Of course.

11          MR. RILEY:  I object to that.  Whether he's happy or

12  not is really not relevant.

13          MS. BONJEAN:  Well --

14          THE COURT:  Continue with the question.

15          MS. BONJEAN:  Yes.

16  BY MS. BONJEAN:

17  Q    Has --

18          THE COURT:  Would you do it?

19          THE WITNESS:  Yeah, will I, sure.

20  BY MS. BONJEAN:

21  Q    You will be subject to a deposition in this case,

22  correct?

23  A    Sure.

24  Q    And your report is going to identify all of the relevant

25  issues and factors that you considered, correct?

1    A    That's correct.

2    Q    The reports that you submitted thus far were for a

3    limited purpose, right?

4    A    That's correct.

5    Q    And what was that purpose?

6    A    To be able to establish sample size and identify some of

7    the variables that we will be looking at.

8    Q    And some of the variables listed are -- excuse me, the

9    variables you listed, it's just a list of potential variables

10   that one would look at if they're doing this type of analysis,

11   correct?

12   A    That's correct.

13   Q    We're not necessarily -- drill down on every single

14   issue, no one's asked you to do that, right?

15   A    That's right.

16   Q    Okay.

17             MS. BONJEAN:  I have nothing further.

18             THE COURT:  Any recross?

19             MR. GELFAND:  Not from me, Your Honor.

20             MR. RILEY:  Yes, Judge, just briefly.

21                     RECROSS EXAMINATION

22   BY MR. RILEY:

23   Q    Now that Ms. Bonjean had a chance to put you through

24   what's called redirect examination, take a moment and tell the

25   Judge the seven predictors, now that we've had a opportunity

Shane - Recross (Ril)                                    118

1    to hear the subsequent testimony?

2    A    I would look at things like age --

3    Q    Not look at things.  What are they?

4    A    Oh I --

5              MS. BONJEAN:  Objection, Judge.  This is putting the

6    cart before the horse.

7              THE COURT:  Are you able to tell us now, Dr. Shane,

8    without consulting with your attorney in more detail, what the

9    seven predictors are that you're going to use to test your

10   hypothesis?

11             THE WITNESS:  Possibly, Your Honor.  Because you

12   would want to look at a combination of different things that I

13   would have to look at.

14             Without consulting with my attorney, it would be

15   things like age, race, sex, years of time on the Police

16   Department, type of assignment, supervisor, things like that.

17             THE COURT:  Those would be part of the seven

18   predictors?

19             THE WITNESS:  Yes.

20             THE COURT:  Anything else you can think of off the

21   top of your head, before consulting with counsel?

22             THE WITNESS:  Chief of police.

23             THE COURT:  Type of deployment?  Would you look at

24   that?

25             THE WITNESS:  Yeah.  Well you call it deployment, I

Shane - Recross (Ril)                                119

1   call it assignment.  But, yes.

2              THE COURT:  Type of complaint?  Would you look at

3   that?

4              THE WITNESS:  Yes.

5              THE COURT:  So far I think we're above seven.

6              THE WITNESS:  Well that's my point, right.  Seven to

7   ten, and that's how the analysis is driven.

8              THE COURT:  So can you focus in what I think it

9   might be a red herring here, and what I think has people so

10  troubled.  You keep on talking about race.  What does race

11  have to do with this case?  Does it have anything to do -- it

12  doesn't have anything to do with this case, so why do you have

13  to look at it?

14             THE WITNESS:  Because you would be interested in

15  controlling for that influence on whether or not the process

16  is flawed, or whether or not there is a different outcome.

17             THE COURT:  So that would be a controlling factor?

18             THE WITNESS:  Correct.

19             THE COURT:  Okay.  Mr. Riley, anything else?

20             MR. RILEY:  Yes, sir.

21  BY MR. RILEY:

22  Q    You would agree, sir, with me that -- that really the

23  gold standard of whether or not the Internal Affairs Office is

24  functioning properly and consistent with the law is the

25  Attorney General's guidelines, right?

Shane - Recross (Ril)                                120

1    A    Yes.

2    Q    Okay.  Without regard to national standard or anything

3    else, in New Jersey, does the New Jersey Police Department

4    Internal Affairs function is going to be judged, whether

5    they're doing their job properly or not, by the Attorney

6    General's guidelines, yes?

7    A    Well they might find themselves outside the scope of

8    accepted practice if the AG guideline has not kept pace with

9    national standards.

10   Q    So are you now critical of the Attorney General's

11   guidelines?

12   A    Not at the moment, no.  But I'm just making that point to

13   you to that the answer is, yes, we would want to map to the AG

14   guideline, but we would also want to say whether or not that

15   guideline comports with accepted police practices nationally.

16   Q    So then you're starting with the go on simply beyond

17   Internal Affairs in Atlantic City to look at whether or not

18   the Attorney General of the State of New Jersey guidelines are

19   appropriate, correct?

20   A    Sure.

21   Q    Okay.  Is the Attorney General aware of that, that you're

22   going to be looking at his standards?

23   A    I don't think so.

24   Q    I don't think so either.  Let me ask you this question.

25   Now will you agree with me that the top seven predictors that

1   should be considered, okay, without regard to phone numbers

2   and area codes, or race, or whatever, should be elements and

3   variables that are contained in the Attorney General's

4   guidelines?

5              MS. BONJEAN:  Objection.  This is --

6              THE COURT:  Overruled.  Please, Ms. Bonjean, let Mr.

7   Riley continue.

8   BY MR. RILEY:

9   Q    Do you understand my question?

10  A    Can you repeat it, please?

11  Q    Sure.  Wouldn't you agree with me that if the gold

12  standard in New Jersey is the Attorney General's guidelines,

13  that those seven so-called predictors should reflect the

14  elements and the variables that are contained in those

15  guidelines to be tested by your study --

16             THE COURT:  Are you talking about a process analysis

17  or a statistical analysis?

18             MS. BONJEAN:  Yes.

19             THE COURT:  Ms. Bonjean, please.

20             MS. BONJEAN:  I'm -- okay.  Sorry, Judge.

21             THE COURT:  Mr. Riley, are you talking about a

22  process analysis or a statistical analysis?

23  BY MR. RILEY:

24  Q    What type of process, and what type of analysis do you

25  intend to conduct?

Shane - Recross (Ril)                                    122

1    A    Both.

2    Q    Okay.  Both.  These seven variables, shouldn't they

3    reflect what the requirements are in the Attorney General's

4    guidelines?

5    A    And I would also like to determine whether or not those

6    guidelines comport with national standards, yes.

7    Q    So --

8    A    If we discover that they don't --

9    Q    Well let me ask you this question.  If Internal Affairs

10   in Atlantic City complies with the Attorney General

11   guidelines, you'd still be critical of them because they don't

12   comport to a national guideline?

13   A    Well, of course.  I mean, that argument can be easily

14   talked about in terms of, you know, <u>Tennessee v. Garner</u>.  You

15   put out a decision on use of force, and a Police Department

16   doesn't adopt the use of force standard, they're operating

17   like it was 1975.  Of course.

18   Q    Now you're talking about a situation when the state

19   authority tells a municipal police department what to do.  I'm

20   not talking about that.  I'm talking about Internal Affairs in

21   Atlantic City complying 100 percent with the Attorney

22   General's guidelines.  Following me so far?

23   A    I'm saying that the guidelines could potentially be

24   outside the realm of accepted practice nationally in policing,

25   yes.

Shane - Redirect                                    123

1    Q    And then Atlantic City would be held responsible for that

2    because Attorney General's guidelines were not as expansive as

3    the national standards?

4    A    If they fail to include reasonable measures, yes, of

5    course they would.

6    Q    All right.

7              MR. RILEY:  Thank you, Judge.

8              MS. BONJEAN:  I have just a couple of follow up on

9    Mr. Riley.  And I won't take long, Your Honor.

10             THE COURT:  Please, Ms. Bonjean, this better be

11   short.

12             MS. BONJEAN:  It is.

13                    FURTHER REDIRECT EXAMINATION

14   BY MS. BONJEAN:

15   Q    In your -- in civil rights litigation are we governed by

16   the U.S. Constitution or the New Jersey Constitution?

17   A    It's the United States Constitution.

18   Q    Okay.  And Mr. Riley seems to be conflating two issues

19   here.  You have process evaluation, right?

20   A    Yes.

21   Q    Which is comparing against the AG's office and national

22   norms, right?

23   A    Correct.

24   Q    And then we also have this issue of statistical analysis,

25   correct?

1   A    Correct.

2   Q    And in terms of race, no one's asked you to look at race

3   as a indicator of -- we're not testing race, but you may want

4   to control for race, correct?

5   A    Correct.

6   Q    So that the other side can't say, oh, well these -- in

7   cases involving -- what I want to be -- strike this.

8            Let me ask you this.  Is it fair to say that we

9   control for something like race so that you can say either to

10  a jury, or to anybody, that whether it involves white people,

11  African American people, Latino people, we have the same

12  outcome.  The Police Department is still doing this.

13  A    That's the whole purpose.

14  Q    That's why you control --

15  A    That's why you control for those demographic

16  characteristics.

17  Q    Correct.

18            MS. BONJEAN:  Thank you.

19            THE COURT:  Mr. Riley, I'm reluctant to ask this,

20  but is there anything else?

21            MR. RILEY:  No.  I'm fine, Judge.  Thank you.

22            THE COURT:  Dr. Shane, thank you very much.

23            THE WITNESS:  Okay.

24            THE COURT:  You're welcome to stay, this is a public

25  courtroom.  But if you want to excuse yourself, you're welcome

1  to do that.

2          THE WITNESS:  Okay.  Thank you.

3       (End of requested portion 4:04 p.m.)

4              C E R T I F I C A T I O N

5  I, Josette Jones, court approved transcriber, certify that the

6  foregoing is a correct transcript from the official digital

7  audio recording of the proceedings in the above-entitled

8  matter.

9

10  _____          01/16/15

11  JOSETTE JONES                           DATE

12  DIANA DOMAN TRANSCRIBING, LLC